## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 7** |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| **Debtor** | : | **Bky. No. 07-11008ELF** |
| | : | |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ERIC ABBATIELLO, et al.,** | : | **Adv. No. 09-051** |
| | : | |
| **Defendants** | : | |

## O R D E R

**AND NOW**, the trial of the liability issue in the above adversary proceeding having

concluded initially on November 30, 2009;

**AND,** one of the factual issues in the liability phase of the trial being whether two (2)

horses, Mac's Derrick T and Mac Only VP ("the 2 Horses"), were stabled at Magical Acres Farm

or on the premises of Showplace Farms in February 2007;

**AND,** on December 7, 2009, Defendants Abbatiello, Shay and Showplace Farms

(collectively, "the Defendants")[1] having filed a Motion to Reopen the Trial and Permit

Additional Testimony as a Result of Defendants Obtaining Newly Discovered Evidence After the

Completion of Trial and later an amended motion (collectively "the Motion") (Doc. #'s 121,

---

[1]      The Plaintiff's claims against the fourth defendant, Gaitway Farm, Inc. were dismissed
after the completion of the Plaintiff's case-in-chief, pursuant to Fed. R. Bankr. P. 7052 (incorporating
Fed. R. Civ. P. 52(c)).

124);

**AND**, in the Motion, in addition to requesting that the trial record be reopened to permit additional testimony, the Defendants also having requested the dismissal of the Complaint as a sanction for the Plaintiff's alleged efforts to suborn perjury prior to completion of the trial on November 30, 2010 ("the Sanctions Request");

**AND,** the Plaintiff having opposed the Motion (including the Sanctions Request);

**AND,** after a hearing, the court having entered an order dated January 26, 2010 (Doc. #142):

    A. granting the Motion in part by reopening the trial record to permit additional evidence on the subject of the location of 2 Horses in February 2007 in the form of testimony from Joseph Eisenhower ("Eisenhower") and any evidence in response that the Plaintiff chose to offer ("the Supplemental Trial Record);

    B. deferring a decision on the Sanctions request pending the development of an evidentiary record ("the Sanctions Record"); and

    C. scheduling a consolidated hearing on February 22, 2010 ("the Consolidated Hearing") to develop the Supplemental Trial Record and the Sanctions Record;

**AND,** the Consolidated Hearing having been held and concluded on February 22, 2010;

\*    \*    \*    \*

**AND,** three (3) witnesses having testified at the Consolidated Hearing: Eisenhower, the Plaintiff and Kenneth N. Sandler ("Sandler");

**AND**, the following facts being undisputed:

    A. Eisenhower and the Plaintiff spoke in-person at the Turf Club in Philadelphia on November 29, 2009 regarding the possibility of Eisenhower testifying on the Plaintiff's behalf at the trial of this adversary proceeding on November 30, 2010;

-2-

B. Eisenhower's potential testimony involved two (2) different factual issues that had arisen during the trial:

    (1) the whereabouts of the 2 Horses in early 2007 ("the Whereabouts Issue"); and

    (2) the existence or non-existence of an accepted practice among "horsemen" of "turning out" horses in a paddock during the winter months ("the Winter Issue");[2]

C. Eisenhower's opinion regarding the Winter Issue is favorable to the Plaintiff's position in this adversary proceeding and he communicated that to Plaintiff on November 29, 2009;

D. While at the Turf Club on November 29, 2009, and in the Plaintiff's presence, Eisenhower also spoke by telephone with Sandler, who is one of the Plaintiff's attorneys;

E. In the Eisenhower-Sandler telephone conversation, Eisenhower communicated his willingness to testify for the Plaintiff with respect to the Winter Issue;

F. As a result of his conversation with Eisenhower, Sandler decided that he would not call Eisenhower as a witness;

G. Immediately following Eisenhower's telephone conversation with Sandler, while still at the Turf Club, Eisenhower and the Plaintiff had a further conversation regarding the possibility of Eisenhower testifying on the Plaintiff's behalf;

---

[2]    Earlier in the trial, the Plaintiff testified that he saw the 2 Horses outside in a paddock at Showplace Farms within a few days after the filing of his bankruptcy case. He offered this testimony in support of his claim that the Defendants prevented him from taking possession of the horses and that their conduct violated 11 U.S.C. §362(a)(3). The Defendants have contested vigorously the Plaintiff's factual assertion and presented evidence that the horses were stabled at Magical Acres in February 2007 and therefore, the Plaintiff could not possibly have seen them at Showplace Farms. The Defendants also presented testimony that it would be contrary to common practice in the industry for the horses to have been "turned out" in a paddock during the winter. The Plaintiff was hoping that Eisenhower would provide testimony, as an experienced horseman, that in his opinion, it would not be unusual or harmful for a horse to spend time outside in a field in the winter. Such testimony would have been consistent with the Plaintiff's testimony that he saw the horses in the field at Showplace Farms in February 2007 and contradicted the defense testimony on the subject.

**AND**, with the exception of the undisputed facts set forth above, the testimony of the witnesses conflicting substantially with respect to the content of the conversations that took place on November 29, 2009;[3]

---

[3]     Eisenhower testified that in an earlier conversation with the Plaintiff in September 2009, he told the Plaintiff, unequivocally, that the horses were at Magical Acres in February 2007.  He testified that on November 29, 2009, the Plaintiff put him on the telephone with Sandler because he was willing to testify that horses could be "turned out" in a paddock in the winter.  Eisenhower claimed that, at the outset of that telephone conversation, before discussing the Winter Issue, he told Sandler that he knew the horses were at Magical Acres in February 2007.   Eisenhower then testified that after he concluded his telephone conversation with Sandler, the Plaintiff offered him money to testify falsely that the horses were not at Magical Acres on February 19, 2007.

The Plaintiff told a different version.  He testified that on November 29th, Eisenhower told him that he (Eisenhower) was aware that the 2 Horses were not stabled at Magical Acres until the spring of 2007 (i.e., after February 19, 2007), which was one (1) reason he asked Eisenhower to speak with Sandler about the possibility of testifying the next day (the other reason being Eisenhower's supportive opinion on the Winter Issue).  The Plaintiff denied offering Eisenhower any money for false testimony.  He acknowledged that money was discussed, but suggested that the discussion referred only to reimbursement of travel expenses if Eisenhower testified as a fact witness on the Whereabouts Issue and perhaps a higher payment for expert testimony on the Winter Issue.

As for Sandler, while he did not recall precisely the details of his conversation with Eisenhower, he seemed certain that Eisenhower did not tell him specifically that the horses were at Magical Acres on February 19, 2007 (as Eisenhower testified).  Sandler also testified that whatever the precise content of the information Eisenhower claimed to have regarding the horses' whereabouts, Sandler concluded quickly that the information was not based on personal knowledge, making Eisenhower unsuitable as a witness with respect to the Whereabouts Issue.

It is obvious that Eisenhower's testimony the Plaintiff's testimony are contradictory.  It also is impossible reconcile Eisenhower's testimony with Sandler's.  Eisenhower testified that he personally saw the 2 Horses at Magical Farms in February 2007.  If, as he claims, he told that to Sandler during their telephone conversation, Sandler could not have concluded (as he testified) that Eisenhower's information was not based on personal knowledge; rather, Sandler would have concluded simply that Eisenhower's testimony would not be helpful (and, in fact, would be harmful) to the Plaintiff's case and, for that reason, would have made the decision not to call him as a witness.

**AND**, the court concluding that Sandler's testimony was more credible than

Eisenhower's;[4]

**AND**, the court further concluding that following the conclusion of Eisenhower's

telephone conversation with Sandler, the Plaintiff did not offer Eisenhower money to induce him

---

[4]      While, neither witness is directly involved in the underlying events that gave rise to this litigation, I resolve this conflict, in large part (but not exclusively), based on the witnesses' relative potential for bias.

Sandler, of course, is involved in this litigation as counsel for the Plaintiff. Naturally, his role as counsel may create a potential for bias. However, Sandler is a professional who is bound by the rules of professional conduct governing attorneys. Based upon my observation of his demeanor during his testimony, I found him credible. I consider it unlikely that he would have purposely provided false testimony in violation of his ethical obligations. Further, apart from the potential for bias, his explanation for not calling Eisenhower as a witness (i.e., lack of personal knowledge) is consistent with common practice; trial attorneys routinely decide not to call witnesses that lack personal knowledge of the facts at issue. Finally, while Sandler did not remember many details regarding his telephone conversation with Eisenhower, I consider likely that he would remember why he decided not to call Eisenhower – a potential witness brought to his attention by his client on the eve of trial, while he was in the midst of his final trial preparations.

In comparison, I find that Eisenhower's testimony may have been influenced by his relationship with Howard Taylor. Taylor is an attorney who is deeply involved in various capacities in the horse racing industry. Eisenhower expressed admiration for Taylor as a "a horseman's advocate for many [in] my lifetime." (N.T. at 38). Taylor also has served as Eisenhower's attorney. Taylor represented the Defendants in this proceeding, before withdrawing as counsel and appearing as a witness at trial. While Taylor was in the courthouse during one of the trial dates in this proceeding, he and the Plaintiff were involved in an incident that agitated Taylor and left him furious with the Plaintiff. (The incident, which occurred outside of the courtroom, but was brought to the court's attention on the record, was resolved after the intervention of the U.S. Marshal service). The incident came to Eisenhower's attention when he read an emotional description of it that Taylor posted on an internet website. That description painted the Plaintiff in an extremely negative light and left no doubt that Taylor was hoping to obtain some form of retribution against the Plaintiff from the wrongdoing he believed occurred during the courthouse incident. After Eisenhower read the internet posting, he contacted Taylor. Taylor put Eisenhower in touch with the Defendants' counsel, which resulted in his testimony at the Consolidated Hearing.

Based on the considerations described above, I consider it more likely that Eisenhower's testimony was colored by his allegiance to Taylor than that Sandler's testimony was either purposely false or otherwise in error.

to provide false testimony in this adversary proceeding;[5]

* * * *

It is therefore **ORDERED** that:

1.  The Motion is **DENIED** insofar as it seeks dismissal of this adversary proceeding as a

sanction.

2.  The Plaintiff shall file Proposed Findings of Fact, Conclusions of Law and any supporting

Memorandum of Law **on or before May 7, 2010**.

3.  The Defendants shall file Proposed Findings of Fact, Conclusions of Law and any supporting

Memorandum of Law **on or before June 4, 2010**.

4.  If the Plaintiff wishes file a Reply Memorandum of Law, he shall do so on or before **June 15,**

**2010**.

5.  **The parties shall not file any other post-trial submissions without leave of court**.

Date:   **April 14, 2010**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

[5]          While neither Eisenhower nor the Plaintiff seemed certain as to what payments a witness
may permissibly receive, they both seemed to understand that a fact witness can receive travel
reimbursement and that an expert can be paid a fee.  Thus, the fact that they discussed payment, by itself,
does not convince me that the Plaintiff proposed to make the payment to induce false testimony.  In these
circumstances, it would have been easy for Eisenhower to have misunderstood the Plaintiff's statements
and motivations.  Further, for the reasons stated earlier, see n.4 supra, Eisenhower's credibility is
sufficiently suspect that I am unwilling, based on his testimony alone, to conclude that the Plaintiff
would commit the crime of suborning perjury in order to prevail in this litigation.

Finally, I note that in resolving this disputed factual issue in the Plaintiff's favor, I draw
no further conclusions at this time regarding the Plaintiff's credibility with respect to the various other
subjects in which his credibility was disputed by the Defendants during the course of the liability phase
of this adversary proceeding.  Undoubtedly, I will return to that subject when I resolve the merits of the
parties' dispute after they have filed their post-trial written submissions.