## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 7** |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| Debtor. | : | **Bky. No. 07-11008 ELF** |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **ERIC ABBATIELLO, et al.,** | : | **Adv. No. 09-051** |
| | : | |
| Defendants. | : | |

# O P I N I O N

# I.  INTRODUCTION

In this adversary proceeding, the Plaintiff-Debtor Rafail Theokary ("the Debtor") asserts that Defendants Eric Abbatiello ("Abbatiello"), Tom Shay ("Shay"), Showplace Farms ("Showplace") and Gaitway Farms, Inc. ("Gaitway"), willfully violated the automatic stay, 11 U.S.C. §362(a), during the course of his no-asset bankruptcy case.  The Debtor seeks monetary damages from the Defendants.  See 11 U.S.C. §362(k).  Trial of the liability issues was bifurcated from the damages issues.

The crux of the dispute as to liability can be summarized concisely.

When the Debtor filed this bankruptcy case on February 16, 2007, he held a leasehold

interest in three standardbred race horses[1] (when referred to collectively, "the Horses").  The

Highland Group ("Highland") was the owner-lessor of the Horses.  After leasing the Horses, the

Debtor engaged Shay or Abbatiello to train the horses and, at one time or another, boarded them

at Gaitway and Showplace.  The Debtor then failed to pay everything due to Shay, Abbatiello,

Showplace and Gaitway for the services they provided.

      Two days after the commencement of this bankruptcy case, and with notice of the filing,

Shay and Abbatiello enforced their respective statutory liens against the Horses by conducting

stableman's lien sales of the Horses.  See N.J.S.A. §§2A:44-51 to 2A:44-52.  The stableman's

lien sales, which were later confirmed by order of the New Jersey Superior Court, terminated

Highland's ownership of the Horses.  The Debtor contends that the liens sales also terminated his

leasehold interests in the Horses, thereby violating the automatic stay.  In addition, the Debtor

contends that Showplace violated the automatic stay by interfering with his attempt to take

possession of two of the Horses after commencement of the bankruptcy case.  Showplace denies

this allegation.

      As explained below, I conclude that the stableman's lien sales terminated the Debtor's

leasehold interests in the Horses and therefore, Shay and Abbatiello violated the automatic stay,

11 U.S.C. §362(a)(3), by conducting the sales.  I also find that neither Showplace nor Gaitway

took any action while the automatic stay was in place that interfered with the Debtor's rights

under the pre-petition leases or that otherwise violated the automatic stay.

      Consequently, I will:

---

[1]     Standardbred race horses are commonly referred to as "trotters."  When they race, they are hitched to a "sulky," which is a two-wheeled carriage in which the jockey rides.

(1) enter judgment in favor of the Debtor against Shay and Abbatiello;

(2) enter judgment in favor of Showplace and Gaitway and against the Debtor; and

(3) schedule a damages hearing at the earliest possible date on the Debtor's claims against Shay and Abbatiello.

## II.  PROCEDURAL HISTORY

The Debtor commenced a chapter 7 bankruptcy case on February 16, 2007.  In the course of the case, the Debtor filed an Amended Schedule G in which he disclosed his leasehold interest in the Horses.  (Bky. No. 07-11008, Doc. # 49).  On September 12, 2007, the chapter 7 Trustee ("the Trustee") filed a no-asset report.  On January 14, 2008, the court entered the Debtor's chapter 7 discharge and an order directing the Clerk to close the case.  (Bky. No. 07-11008, Doc. #'s 52, 53).  The docket reflects that the Clerk did so on January 17, 2008.[2]

On August 27, 2008, the Debtor filed a Motion to Reopen the bankruptcy case.  (Bky. No. 07-11008, Doc. # 56).  The court held a hearing on the Motion to Reopen on November 4, 2008 and shortly thereafter, issued a Memorandum Opinion and Order granting the Motion.  See In re Theokary, 2008 WL 5329310 (Bankr. E.D. Pa. Dec. 19, 2008).

On February 20, 2009, the Debtor commenced this adversary proceeding by filing a

---

[2]    The case docket reflects that, the Trustee held, but did not conclude, the §341 meeting of creditors on May 17, 2007.  In the no-asset report filed on September 12, 2007, the Trustee did not indicate whether the meeting of creditors had been concluded.  This caused a delay in the entry of the discharge order and the closing of the case.  On January 8, 2008, the Trustee finally reported the meeting of creditors as "concluded."  This resulted in the entry of the discharge order and the closing of the case.

Complaint. The Defendants answered the Complaint on February 24, 2009.[3] The pretrial

process was singularly contentious, marked by numerous dispositive, discovery and sanction

motions filed by both sides, many of which were filed without complying with the rules of court

and all of which were denied.[4] At the final pretrial conference on September 10, 2009, I decided

to bifurcate the liability and damages phases of the trial.

The trial on liability commenced on November 9, 2009. After the Plaintiff completed

presentation of his case-in-chief on the first day of trial, the Defendants moved for entry of

judgment in their favor. See Fed. R. Civ. P. 52(c) and 54(b) (incorporated by Fed. R. Bankr. P.

7052 and 7054).[5] I orally granted the motion as to Gaitway and denied it as to the other

---

[3]    Prior to February 23, 2009, both the main bankruptcy case and the adversary proceeding
were on the docket of the Hon. Diane W. Sigmund. On February 23, 2009, both were reassigned to the
undersigned judge in anticipation of Judge Sigmund's impending retirement.

[4]    Some of the procedural wranglings are described in the court's orders dated July 24,
2009 and October 12, 2009. (Adv. No. 09-051, Doc. #'s 78, 106).

[5]    Rule 52(c) provides, in pertinent part:

> If a party has been fully heard on an issue during a nonjury trial and the court
> finds against the party on that issue, the court may enter judgment against the
> party on a claim or defense that, under controlling law, can be maintained or
> defeated only with a favorable finding on that issue.

Rule 54(b) provides, in pertinent part:

> [W]hen multiple parties are involved [in an action], the court may direct entry of
> a final judgment as to one or more, but fewer than all, claims or parties only if
> the court expressly determines that there is no just reason for delay. Otherwise,
> any order or other decision, however designated, that adjudicates fewer than all
> the claims or the rights and liabilities of fewer than all the parties does not end
> the action as to any of the claims or parties and may be revised at any time
> before the entry of a judgment adjudicating all the claims and all the parties'
> rights and liabilities.

-4-

Defendants.  On November 23, 2009, the Clerk docketed a written order entering judgment in

favor of Gaitway and against the Plaintiff.  (Adv. No. 09-051, Doc. # 112).  The Plaintiff

appealed that order to the district court on December 7, 2009.[6]  I will discuss the disposition of

the appeal at the end of this recitation of the procedural history.

The trial concluded (initially) after a second day of testimony on November 30, 2009,

after which the court established a schedule for the filing of post-trial submissions by the parties.

(Adv. No. 09-051, Doc. # 117).  However, on December 7, 2009, the Defendants filed a Motion

to Re-Open the Trial and Permit Additional Testimony as a Result of Defendants Obtaining

Newly Discovered Evidence After Completion of the Trial.  (Adv. No. 09-051, Doc. # 121).

After a hearing held on January 20, 2010, I granted that motion, in part,[7] by order dated January

26, 2010.  (Adv. No. 09-051, Doc. # 141).  Consequently, a third and final day of trial was held

on February 22, 2010, after which I established a new schedule for the filing of post-trial

submissions by the parties.  (Adv. No. 09-051, Doc. # 162).  The last post-trial submission was

filed on June 15, 2010.

On July 1, 2010, the district court remanded the Plaintiff's appeal from the November 23,

2009 order dismissing the Plaintiff's claims against Gaitway for the issuance of a "more detailed

---

[6]     But see 28 U.S.C. §158(a) (generally limiting district court appellate jurisdiction of
bankruptcy court decisions to appeals from "final judgments, orders, and decrees"); Sulima v. Tobyhanna
Army Depot, 602 F.3d 177, 183 (3d Cir. 2010) (in "action involving claims against multiple parties, a
judgment that resolves less than all of the claims against all of the parties is not a 'final' judgment unless
the court 'expressly determines that there is no just reason for delay'" under Rule 54(b)).


[7]     The Motion to Reopen the Trial included the serious allegation that the Plaintiff's
counsel had suborned perjury during the trial and requested that he be sanctioned by dismissal of this
proceeding.  The Defendants' motion in this regard was denied after an evidentiary hearing.  (Adv. No.
09-051, Doc. # 162).

opinion" explaining the reasons for the dismissal of Gaitway. (Adv. No. 09-051, Doc. # 172).

This Opinion is intended to comply with the district court's mandate as well as Fed. R. Civ. P.

52(a).[8]

## III.  FINDINGS OF FACT

After consideration of the testimony presented at trial,[9] the documentary evidence, the

pleadings, the facts stipulated to by the parties and the parties' post-trial submissions, and based

upon my assessment of the credibility of the testifying witnesses, I make the following findings

of fact.  To the extent the witnesses at trial offered conflicting testimony on issues relevant to the

disposition of this adversary proceeding, my findings of fact reflect my resolution of those

conflicts based on my assessment of the witnesses' demeanor, motivations, credibility, and

related factors.

### the parties

1.   Plaintiff Rafail Theokary is the debtor in this bankruptcy case.

2.   Shay is an individual who is in the business of training horses.

3.   Abbatiello is an individual who is in the business of training horses.  He conducts business

---

[8]      Rule 52(a) provides, inter alia, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."

[9]      Eleven witnesses testified (some more than once) during the course of the trial: Timothy Zearfoss (the Debtor's general bankruptcy counsel), the Debtor, Jeffrey Pocaro (the Defendants' counsel), Bix L. DiMeo (general manager of Showplace), Shay, Howard Taylor (former counsel to the Defendants in this adversary proceeding), J. Neal Ehrhart (a horse trainer), Abbatiello, Samuel J. Paparo, Sr. (a horse trainer), Joseph Eisenhower, and Kenneth Sandler (the Plaintiff's counsel).

under the name "Abbatiello Racing Stables."

4.   Gaitway is a corporation that is in the business of boarding horses.  It is located at 355

Highway # 33, Manalapan, New Jersey.

5.   Showplace is a limited liability company that is in the business of boarding horses.  It is

located at 505 Highway # 33, Manalapan, New Jersey.

### the First Leases and training agreements

6.   On June 1, 2005, the Debtor entered into two lease agreements with McCord Farms pursuant

to which he leased two horses for a twenty-four month term: Mac Only VP, Mac's Emily

BJ.  (Exs. P-5, P-6).

7.   On July 23, 2005, the Debtor entered into a lease agreement with McCord Farms pursuant to

which he leased another horse for a twenty-four month term, Mac's Derrick T.  (Ex. P-4).

8.   All three of the leases (collectively, "the First Leases"):

   a.   stated the parties' intention to race each horse with a final intention to sell the
        horse;

   b.   provided for purse distributions of 70% to the Debtor and 30% to McCord Farms;

   c.   provided for a division of the final sale price of 20% to the Debtor and 80% to
        McCord Farms; and,

   d..  imposed on the Debtor all responsibility for costs incurred in maintaining the
        horse.

9.   In January 2006, the Debtor entered into separate oral agreements with Shay and Abbatiello

to train and feed the Horses.

10.  The Debtor retained Shay to train Mac's Derrick T and Mac Only VP.

11. The Debtor retained Abbatiello to train Mac's Emily BJ.[10]

12. The Debtor's agreements with Shay and Abbatiello required him to pay the trainer's fees for

their services and to pay the boarding bills for the Horses.


**the boarding of Mac's Derrick T and Mac Only VP and Mac's Emily BJ**

13. Initially, Shay boarded Mac's Derrick T and Mac Only VP at Showplace.

14. In May 2006, Shay took Mac's Derrick T and Mac Only VP from Showplace Farms to

Pocono Downs, a racing facility in Wilkes-Barre, PA.

15. In October 2006, Shay took Mac's Derrick T and Mac Only VP to Magical Acres Farm

("Magical Acres"), where they remained through February 18, 2007.[11]

_____

[10]      Abbatiello testified, credibly, the Debtor leased horses other than Mac's Derrick T,  Mac
Only VP and Mac's Emily BJ and retained Abbatiello to train several of them.  At some point, however,
the Debtor took the horses back from Abbatiello in a manner that caused some friction.  Abbatiello stated
that the Debtor took the horses from the stables "in the middle of the night" and, in doing so, also took a
horse that belonged to Abbatiello's father.  The Debtor later returned that horse.


[11]      This finding was perhaps the most hotly contested factual issue at trial.  The Debtor
testified that he personally saw Mac's Derrick T (and maybe also Mac Only VP) at Showplace on
February 20, 2007, two days after the stableman's lien sales.  The Debtor's contention that the two horses
were present at Showplace on February 20, 2007 and that he was rebuffed in his effort take possession of
the horses that day is one basis for his claim that Showplace violated the automatic stay.  See Part V.C.2.,
infra.  The Debtor's testimony was flatly contradicted by Shay and Bix L. DeMeo (the general manager
of Showplace).   Shay and DiMeo testified that the two horses were taken from Showplace in May 2006
and thereafter, did not return to Showplace.

After considering the parties' diametrically opposing testimony, I find the testimony of
Shay and DeMeo more credible than the Debtor's testimony on this point and therefore, I resolve the
disputed fact issue as set forth in Finding of Fact No. 15.  Not only were Shay and DiMeo more credible
witnesses, but there is no documentary evidence in Showplace's business records that the two horses
were boarded there after May 2006.

In addition, the testimony at trial suggested to me that it is not always easy, even for
experienced horsemen, to identify a horse based on a short period of visual observation (i.e., many horses
are similar in appearance).  Indeed, in another instance described at trial, the Debtor erred in identifying a
horse as his own.  See 10, supra.  Thus, while I am satisfied that the Debtor sincerely believes that he saw

(continued...)

16.   Initially, Abbatiello boarded Mac's Emily BJ at Gaitway.

17.   In August 2006, Abbatiello transported Mac's Emily BJ from Gaitway to his father's farm,

      about twenty miles away in Colt's Neck, NJ, where the horse remained prior to the February

      18, 2007 stableman's lien sale.

18.   On February 18, 2007, Abbatiello transported Mac's Emily BJ to Gaitway for the purpose of

      exposing the horse to a stableman's lien sale.  After the conclusion of the sale that day,

      Abbatiello brought the horse back to his father's farm.


      **the initial state court litigation and the Debtor's New Jersey bankruptcy filing**

19.   After entering into the trainer agreements, the Debtor did not pay all of the trainer's fees due

      to Shay and Abbatiello and did not pay all of the costs for boarding the horses at Showplace

      and Gaitway.

20.   On April 12, 2006, Shay filed a lawsuit in the Superior Court of New Jersey, Cape May

      County against the Debtor and Brenda McCord (the individual Shay believed to be the

      owner of McCord Farms) for unpaid training bills.

21.   On April 12, 2006, Abbatiello filed a lawsuit in the Superior Court of New Jersey, Cape

      May County against the Debtor and Brenda McCord for unpaid training bills.

22.   On May 30, 2006, Showplace filed a lawsuit in the Superior Court of New Jersey, Cape May

      County against the Debtor and Brenda McCord for unpaid boarding bills.

23.   On May 30, 2006, Gaitway filed a lawsuit in the Superior Court of New Jersey, Cape May

      County against the Debtor and Brenda McCord for unpaid boarding bills.

---

[11](...continued)
Mac's Derrick T on February 20, 2007 at Showplace, I am not convinced by a preponderance of the
evidence that the horse he actually saw that day was Mac's Derrick T.

24. On May 23, 2006, Plaintiff filed a chapter 13 bankruptcy petition in the United States

Bankruptcy Court for the District of New Jersey, Camden Vicinage, docketed at Bky. No.

06-14654-GMB (Bankr. D.N.J.) ("the New Jersey Bankruptcy Case").

25. Following the commencement of the New Jersey Bankruptcy Case, the four complaints

referenced in Findings of Fact Nos. 20-23 were dismissed without prejudice.

26. In the New Jersey Bankruptcy Case, the Debtor filed a motion requesting that the court

"enforc[e] the automatic stay" by ordering Shay and Gaitway "to return to the Debtor" the

horses in their possession.  (Bky. No. 06-14654-GMB, Doc. #16 (Bankr. D.N.J.)).[12]  The

bankruptcy court never ruled on the motion.

27. On October 5, 2006, the New Jersey Bankruptcy Case was dismissed by court "for bad faith

filing."[13]  The dismissal order barred the Debtor from filing another chapter 13 bankruptcy

case for 180 days from the entry of the Order.  (Bky. No. 06-14654-GMB, Doc. # 42 (Bankr.

D.N.J.)).

---

[12]        The Motion stated, incorrectly, that Shay and Gaitway were in possession Mac's Emily
BJ (as well as Mac's Derrick T and Mac Only VP).

[13]        Before filing the chapter 13 case in May 2006, the Debtor had filed three unsuccessful
chapter 13 bankruptcy cases in Pennsylvania:

> (1) Bky. No. 98-34734 DWS (filed Nov. 13, 1998; dismissed after confirmation
> May 3, 2001);

> (2) Bky. No. 01-18102 DWS (filed June 1, 2001; dismissed after confirmation
> May 30, 2002); and

> (3) Bky. No. 02-33824 DWS (filed Sept. 27, 2002; dismissed prior to
> confirmation April 3, 2003).

**the Second Leases**

28.   Some time prior to October 31, 2006, McCord Farms transferred ownership of the Horses

to another entity, The Highland Group, LLC ("Highland").

29.   On October 31, 2006, the Debtor entered into three new leases (collectively, "the Second

Leases") with Highland[14] pursuant to which the Debtor leased Mac's Derrick T, Mac Only

VP and Mac's Emily BJ from Highland.  (Exs. P-1, P-2, P-3).  The apparent purpose of the

new leases was to address the transfer of ownership of the Horses from McCord Farms to

Highland.

30.   The Second Leases provided for a termination date of December 31, 2011 and were silent on

any division of proceeds in the event of a sale of the horses.  In all other material respects

the provisions of the Second Leases were the same as the First Leases.


**the February 2007 bankruptcy filing and the stableman's lien sale**

31.   On February 9, 2007 and February 16, 2007, attorney Jeffrey R. Pocaro ("Pocaro"), acting

on Shay's behalf, placed a notice in "The Trentonian" newspaper that a stableman's lien sale

of Mac's Derrick T and Mac Only VP would be held on Sunday, February 18, 2007 at 2:00

p.m. at a horse farm known as Magical Acres.  (Ex. P-18).

32.   On February 9, 2007 and February 16, 2007, Pocaro, acting on Abbatiello's behalf, placed a

notice in "The Asbury Park Press" newspaper that a stableman's lien sale of Mac's Emily BJ

---

[14]      There is likely some relationship between the owners of McCord Farms and Highland.
The signature line on the First Leases authorizes Stan Guest or Brenda McCord to execute the document
on behalf of McCord Farms.  The signature line on the Second Leases authorizes Stan Guest to execute
the document on behalf of Highland.

would be held on Sunday, February 18, 2007 at 10:00 a.m. at Gaitway.[15]  (Ex. P-17).

33.  On Friday, February 16, 2007, at 6:48 p.m., the Debtor filed a voluntary petition under

chapter 7 of the Bankruptcy Code in this court.  The petition was filed electronically by the

Debtor's bankruptcy counsel, Timothy Zearfoss ("Zearfoss").

34.  Immediately, after filing the petition on February 16, 2007, Zearfoss telephoned Pocaro,

whom he understood to represent Shay and Abbatiello, and notified him of the bankruptcy

filing.

35.  In the telephone conversation between Zearfoss and Pocaro on the evening of February 16,

2007:

   a.  Zearfoss stated to Pocaro, the stableman's lien sales scheduled for February 18,
       2007 were stayed as a result of the bankruptcy filing;

   b.  Pocaro stated his opinion that the stay did not apply to the stableman lien sales
       because it was directed against the owner of the horse, not the Debtor.[16]

36.  On Sunday, February 18, 2007 Pocaro, on Shay's behalf, conducted a stableman's lien sale

of Mac's Derrick T and Mac Only VP at Magical Acres.  Shay was not present at the sale.

Through his counsel, Pocaro, Shay purchased the horses for $100.00 each.

---

[15]    Each notice references an underlying case in the New Jersey Superior Court (Cape May
County), one with Shay as Plaintiff, the other with Abbatiello as Plaintiff and both with the Debtor and
Brenda McCord as Defendants.  For whatever significance it may have, the notices do not refer to either
McCord Farms or Highland as a defendant or owner of the horses.  Pocaro mailed the notices to Stan
Guest "c/o The Highland Group, LLC" and to Brenda McCord.  (Ex. D-7).

[16]    At trial, Pocaro testified that during their February 16, 2007 telephone conversation, he
told Zearfoss that the automatic stay did not apply because the stableman's lien sale would not affect the
Debtor's leasehold interest in the Horses.   While Shay and Abbatiello presently contend that the
Debtor's leases were unaffected by the lien sale, I doubt that Pocaro articulated that legal theory during
his conversation with Zearfoss on February 16, 2007.  I consider it more likely that Pocaro gave no
consideration to the effect of the sale on the Debtor's leasehold interest because he perceived the lien
enforcement action in New Jersey as being directed against Highland (the owner of the Horses), not the
Debtor.

37.   On Sunday, February 18, 2007 Pocaro, on Abbatiello's behalf, conducted a stableman's lien
      sale of Mac's Emily BJ at Gaitway.  Abbatiello was present at the sale and purchased the
      horse for $100.00.

**the Defendants' knowledge of the bankruptcy filing and participation in the lien sales**

38.   Prior to the lien sale, Pocaro notified Abbatiello of the Debtor's bankruptcy filing via
      facsimile transmission.  Thereafter, Abbatiello deferred to Pocaro's judgment in determining
      whether the lien sale of Mac's Emily BJ could be held.

39.   Pocaro did not, however, similarly notify Shay of the Debtor's bankruptcy filing before
      conducting the stableman's lien sale of Mac's Derrick T and Mac Only VP.

40.   After preparing the notice of the stableman's lien sale of Mac's Derrick T and Mac Only VP,
      Pocaro did not notify Showplace in advance of the sale that the sale would take place.

41.   There is no evidence that the stableman's lien sales of were conducted on Showplace's
      behalf or that Showplace participated in sale in any manner.

42.   After preparing the notice of the stableman's lien sale of Mac's Emily BJ to be held at
      Gaitway, Pocaro did not notify Gaitway in advance of the scheduled sale.

43.   Gaitway had no connection to the stableman's lien sale of Mac's Emily BJ, other than the
      fact that the sale was conducted on its premises.

45.   There is no evidence that the stableman's lien sales were conducted on behalf of Gaitway or
      that Gaitway participated in any fashion in the conduct of the sale.

**after the February 18, 2007 lien sale**

46.   On or about February 20, 2007, Shay and Abbatiello filed motions in New Jersey Superior

Court, to have the aforesaid stableman's lien sales approved <u>nunc pro tunc</u> ("the First Post-

Sale Motions").[17]

47. On March 27, 2007, New Jersey Superior Court denied the First Post-Sale Motions without

prejudice, hand writing in the order the following explanation: "Theokary Bankruptcy filed

prior to sale and <u>there may be a stay based on the lease</u>." (Ex. P-9) (emphasis added).

48. By letter dated April 13, 2007, the Trustee informed Shay and Abbatiello that he did not

intend to assume the leases between Highland and the Debtor.

49. On April 19, 2007, Shay and Abbatiello again filed motions with the New Jersey Superior

Court for <u>nunc pro tunc</u> approval of the February 18, 2007 stableman's lien sales "the

Second Post-Sale Motions").

50. Shay and Abbatiello filed the Second Post-Sale Motions based on their belief that, as of

April 17, 2007, the leases had been rejected pursuant to 11 U.S.C. §365(d)(1). (Exs. D-1, D-

2).[18]

51. By two orders dated May 8, 2007, the New Jersey Superior Court approved the stableman's

---

[17]     The stableman's lien sale was conducted under the authority of a New Jersey statute,
N.J.S.A. 2A:44-52, which will be discussed further in Part V.A.2., <u>infra</u>. The New Jersey statute makes
no reference to any judicial involvement in the stableman's lien sale process. However, one court has
held that, prior to any sale under §2A:44-52, "the lienor must first proceed . . . by order to show cause
supported by verified complaint or affidavit." <u>White Birch Farms v. Garritano</u>, 559 A.2d 481, 484 (N.J.
Super. Ct. 1987). Shay and Abbatiello likely filed the "nunc pro tunc" motions to comply with the
holding in <u>White Birch Farms</u>.

[18]     §365(d)(1) provides:

> In a case under chapter 7 of this title, if the trustee does not assume or reject an
> executory contract or unexpired lease of residential real property or of personal
> property of the debtor within 60 days after the order for relief, or within such
> additional time as the court, for cause, within such 60-day period, fixes, then
> such contract or lease is deemed rejected.

lien sales of February 18, 2007.  (Exs. P-12A, P-12-B).  As a result, Shay became the owner

of Mac's Derrick T and Mac Only VP and Abbatiello became the owner of Mac's Emily BJ.

52.   Ownership of Mac's Derrick T passed from Shay to Amy Conly as a result of a "claiming

race" at Pocono Downs in May 2007.  Mac's Derrick T is now owned and in the possession

of Bada Bing Stables and Owen C. Eiler, Jr.

53.   Mac Only VP is owned by Suzanne Rheault.  To the best of the parties' knowledge, the

horse presently is in Quebec, Canada.

54.   Abbatiello continues to own and possess Mac's Emily BJ.


# IV.  CONCLUSIONS OF LAW

1.   The Debtor's leasehold interest in the Horses was property of his chapter 7 bankruptcy estate.

2.   The stableman's liens sales conducted by Shay and Abbatiello divested the Debtor of his

leasehold interest in the Horses.

3.   Shay and Abbatiello willfully violated 11 U.S.C. §362(a)(3) by conducting the stableman's

lien sales on February 18, 2007 and by filing the initial motions for nunc pro tunc approval of

the February 18, 2007 stableman's lien sales on February 20, 2007.

4.   Neither Showplace nor Gaitway took any action after the commencement of the bankruptcy

case in violation of 11 U.S.C. §362(a).

# V.  DISCUSSION

## A.  The Debtor's Claims Against Shay and Abbatiello

### 1.

Section 541 of the Bankruptcy Code provides that upon commencement of the case, a

bankruptcy estate is created, which includes "all legal and equitable interests of the debtor."  11

U.S.C. §541(a)(1).  A debtor's interest in an unexpired lease is property of the bankruptcy estate.

See, e.g., In re Rickel Home Centers, Inc., 209 F.3d 291, 300 (3d Cir.), cert. denied, 531 U.S. 873

(2000); In re 48th Street Steakhouse, Inc., 835 F.2d 427, 430 (2d Cir. 1987), cert. denied, 485

U.S. 1035 (1988).

Section 362(a)(3) provides that the commencement of a bankruptcy case stays "any

act to obtain possession of property of the estate or of property from the estate or to exercise

control over property of the estate."  11 U.S.C. § 362(a)(3).  It is one of eight (8) subsections

within the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a).  The automatic

stay is

> one of the fundamental debtor protections provided by the bankruptcy laws. It
> gives the debtor a breathing spell from his creditors. It stops all collection efforts,
> all harassment, and all foreclosure actions. It permits the debtor to attempt a
> repayment or reorganization plan, or simply to be relieved of the financial
> pressures that drove him into bankruptcy. The automatic stay also provides
> creditor protection. Without it, certain creditors would be able to pursue their own
> remedies against the debtor's property.

In re Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d 631, 637 (3d Cir. 1998) (citing

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 340 (1977), U.S. Code Cong. & Admin. News 1978,

pp. 5963, 6296, 6297); accord Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir. 1995).

Section 362(a)(3) is generally viewed as a provision designed to prevent the

"dismemberment" of the bankruptcy estate until the bankruptcy process permits either a financial

reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate.  E.g.,

In re Pintlar Corp., 124 F.3d 1310, 1313 (9th Cir. 1997); In re Allentown Ambassadors, Inc., 361

B.R. 422, 435-36 (Bankr. E.D. Pa. 2007) (citing cases).  While the §362(a)(3) concepts of

"obtaining possession of" and "exercising control over" are not easily applied to intangible assets

such as executory contracts and unexpired leases , it is generally accepted that §362(a)(3) applies

to such assets.  See, e.g., Acands, Inc. v. Travelers Casualty and Surety Co., 435 F.3d 252, 260

(3d Cir. 2006); Allentown Ambassadors, 361 B.R. at 437-38 & n.34.[19]  In other words,

§362(a)(3) is designed to preserve intangible property interests that may have some value to

creditors or a reorganizing debtor.

        In this dispute, Shay and Abbatiello seek to justify their post-petition conduct on the

ground that their collection actions were directed against Highland, not the Debtor.  The Debtor

contends that the Defendants violated §362(a)(3) because a necessary consequence of the

stableman's liens sales that divested Highland of its ownership of the Horses was the

extinguishment of the Debtor's leasehold property interest in the Horses.

        The most prominent precedent standing for the proposition that post-petition legal action

terminating a lessor's ownership of property leased to a bankruptcy debtor violates §362(a)(3) is

the Second Circuit's decision in 48th Street Steakhouse.  In that case, the court reasoned as

follows:

                Because Landlord's attempt to terminate I.S.H.'s lease, if successful, would
                have resulted in the destruction of 48th Street's subtenancy, [the bankruptcy
                court] correctly held that Landlord's termination notice violated the automatic stay

---

[19]        For a general discussion of the application to §362(a)(3) to intangible property rights of a
debtor, see Allentown Ambassadors, 361 B.R. at 437-40.

with respect to 48th Street . . . .

> The Landlord argues that although the automatic stay is designed to preserve the debtor's estate, its protection should not extend to non-bankrupt third parties which are somehow related to the debtor.

> While it is true that I.S.H. is an incidental beneficiary of our decision, this result is permissible where a non-debtor's interest in property is intertwined, as in the present case, with that of a bankrupt debtor. If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay.

835 F.2d at 431;  accord Kreisler v. Goldberg, 478 F.3d 209, 214 -215 (4th Cir. 2007); In re Bibo, Inc., 200 B.R. 348 (B.A.P. 9th Cir. 1996) (senior lienholder's action in foreclosing against real property on which debtor held junior lien, violated §362(a)(3) as completion of foreclosure process would extinguish debtor's lienholder rights), appeal dismissed as moot, 139 F.3d 659 (9th Cir. 1998).

There is no binding precedent in this Circuit directing the bankruptcy courts to follow 48th Street Steakhouse.[20]  However, dictum in one decision of our Court of Appeals arguably supports the Second Circuit's expansive construction of §362(a)(3).  See Acands, 435 F.3d at 259 (per Alito, J.) (stating that §362(a)(3) applies to actions directed against third parties, not only actions directed against the debtor).

Based on the dictum in Acands, as well as the absence of any substantial body of case law rejecting the Second Circuit's position or commentary critical of the decision, I consider it likely

---

[20]      In In re Atl. Bus. & Cmty. Dev. Corp., 901 F.2d 325, 328 (3d Cir. 1990), the Third Circuit cited 48th Street Steakhouse with approval and "join[ed] with the Court of Appeals for the Second Circuit in holding that a possessory interest in real property is within the ambit of the estate in bankruptcy under Section 541, and thus the protection of the automatic stay of Section 362."  However, Atl. Bus. & Cmty. Dev. Corp. involved a landlord proceeding directly against his "tenant at sufferance," and did not involve the question whether a creditor's termination of a lessor's ownership of property violates 11 U.S.C. §362(a)(3) because it has the effect of terminating the lease of a lessee-bankruptcy debtor.  I do not read Third Circuit's decision as explicitly endorsing the 48th Street Steakhouse holding on that issue.

that the Third Circuit will follow 48th Street Steakhouse.  Further, I perceive the result achieved

by the decision to be consistent with the §362(a)'s fundamental purpose of preserving valuable

property rights that may provide a benefit to the debtor's creditors in a liquidation or facilitate a

reorganization.  Concerns that the reach of §362(a) can become excessive are blunted by the

relatively modest consequences of finding it applicable in the circumstances presented.  As I had

occasion to observe in an earlier decision:

> All that is involved is whether a party's conduct is subject to the automatic stay.
> If there is any doubt whether §362(a)(3) applies, a party can seek clarification of
> the scope of the automatic stay or modification of the automatic stay from the
> court. Bankruptcy courts regularly grant relief from the stay pursuant to 11 U.S.C.
> § 362(d). Such proceedings are handled on an expedited basis. See generally 11
> U.S.C. § 362(e) (automatic stay against property of the estate terminates by
> operation of law (30) thirty days after motion is filed under § 362(d) unless the
> court orders the stay to remain in effect after making certain required findings).
> Thus, the automatic stay may only briefly delay a party from taking action.

Allentown Ambassadors, 361 B.R. at 440 n.40.  For these reasons, I will follow 48th Street

Steakhouse.

Application of  48th Street Steakhouse leads to the following dichotomy, depending on

whether the stableman's lien sales terminated not only the Highland Group's ownership of the

Horses, but also the Debtor's leasehold interest in the Horses.  If the lien sale terminated the

leases, Shay and Abbatiello violated §362(a)(3).  If the lien sale did not terminate the leases and

the Debtor's leases passed through the stableman's lien sales intact, then no violation of the

automatic stay occurred.  See Fleet Business Credit, LLC v. Wings Restaurants, Inc., 291 B.R.

550, 555 (N.D. Okla. 2003) (legal action to appoint receiver to collect rent from bankruptcy

debtor does not violate the stay); see generally Fed. R. Bankr. P. 3001(e) (providing procedures

relating to transfer of claim from creditor to assignee after creditor has filed proof of claim in

bankruptcy case).

Therefore, I next consider the legal consequences of the stableman's lien sale under applicable nonbankruptcy law.

## 2.

The New Jersey Stableman's Lien Act "has been in existence for over 100 years."  White Birch Farms, 559 A.2d at 484.  It is presently codified at  N.J.S.A. §2A:44-51 to §2A:44-52.  It grants a lien on horses left for board with a "keeper of a livery stable."  N.J.S.A. §2A:44-51.  The statute expansively defines the term "keeper of a livery stable" to include "a trainer . . . or any other person who has a financial relationship with the owner of the horse."[21]  Id.  The statute also authorizes the keeper in possession of a liened horse to sell the horse at public auction.[22]

---

[21]       N.J.S.A. § 2A:44-51 provides:

> Every keeper of a livery stable or boarding and exchange stable, shall have a lien on all animals left with him in livery, for board, sale or exchange and upon all carriages, wagons, sleighs and harness left with him for storage, sale or exchange for the amount due such proprietor for the board and keep of such animal and also for such storage, and shall have the right, without process of law, to retain the same until the amount of such indebtedness is discharged.

> As used in this section, "keeper of a livery stable" shall include, but need not be limited to, a proprietor of a stable, a trainer, a veterinarian, a farrier, or any other person who has a financial relationship with the owner of the horse.

(emphasis added).

[22]       N.J.S.A. §2A:44-52 provides:

> Property retained by the proprietor under this article shall be sold at public auction, after the expiration of 30 days from the date of such retention.

> Notice of the sale shall be first published once in each of the 2 weeks preceding the day of the sale in a newspaper circulating in the municipality in which the stable is situated, and 5 days notice of the sale shall be given by posting a copy of the notice in 5 public places in the municipality.

(continued...)

The New Jersey Stableman's Lien Act is silent on the question whether a sale under §2A:44-52 divests the property interests of parties other than the owner.[23]  However, there is one venerable, reported decision that provides some guidance on the issue.

In Sullivan v. Clifton, 26 A. 964 (N.J. Err. & App. 1893), the horse owner granted a chattel mortgage to a creditor that was duly recorded.  The owner then left the horse at a livery stable.  The case raised the issue "whether the lien of the chattel mortgage is superior to the statutory lien of the livery stable" under the New Jersey Stableman's Lien Act.  Id.  The court held that the statutory lien was subordinate to the chattel mortgage, reasoning that the lien of [the

---

[22](...continued)

> The proceeds of sale after the deduction of the expenses thereof shall first be applied to the payment of the indebtedness, and the balance, if any, shall be paid to the owner of the property, or his representative. The balance, if not claimed by the owner within 60 days after sale, shall be paid to the municipality, in which the stable is situated, for the support of the poor.

(emphasis added).

As noted earlier, in White Birch Farms, 559 A.2d at 484, a New Jersey court added the procedural gloss to the statute, requiring lienholders to proceed first by seeking an order to show cause or by commencing an action by verified complaint or affidavit.  See n.17, supra.

[23]    Two similar New Jersey statutes are also silent on this question: (1) N.J.S.A. 2A:44-19.1 to 44-19.9 (providing for liens in favor of and liens sales by dry cleaners); (2) N.J.S.A. 2A:44-174 to 44-177 (providing for liens in favor of and lien sales by watch and jewelry repairmen).  By comparison, New Jersey's statute governing garage keeper's liens and lien sales expressly provides that the lien is subordinate to, and any lien sale is subject to, a prior, properly recorded lien.  N.J.S.A. 2A:44-20, 2A:44-29; see also Fox v. Cardone, 136 A. 923 (1st Dist. Ct. Jersey City, 1927).  The statute governing self-storage facility liens and lien sales resolves the issue differently, providing that the self-service storage facility lien is superior to any other lien, except those as to which the facility has notice in writing. N.J.S.A. 2A:44-189; see also N.J.S.A. 12A:7-210(1), (5) (warehousemen's lien sales, which require notice to "all persons known to claim an interest in the goods," are "free of any rights of persons against whom the lien was valid").

The foregoing brief survey demonstrates that the New Jersey Legislature has chosen to expressly elevate the priority of a creditor's statutory lien in some statutes and, subject to certain conditions, to subordinate the lien to existing interests in other statutes in connection with statutorily authorized lien sales.  Consequently, I draw no inferences one way or another based on the legislative silence on the subject in the New Jersey Stableman's Lien Act.

livery stable keeper], being subsequent in time, and taken with full notice of the right of the

latter, must upon principle be subject to it. The court concluded that "[t]he maxim 'prior est in

tempore, potior est in jure, applies" Id. at 965 (emphasis added). Sullivan is consistent with

"[t]he basic rule of lien priority in New Jersey . . . 'first in time, first in right'" Sagi v. Sagi, 902

A.2d 287, 291 ("[t]he basic rule of lien priority in New Jersey is 'first in time, first in right'").

    PNC Bank v. Axelsson, 860 A.2d 1021 (N.J. Super. Ch. 2004) articulates a relevant gloss

on the "first in time" principle. Axelsson is a real property case involving the rights of a

foreclosing creditor vis à vis the holder of an unrecorded easement, not a decision under the

Stableman's Lien Act. Nonetheless, the opinion sets forth general legal principles regarding the

competing interests of creditors and holders of unrecorded interests that are sound and of general

applicability in New Jersey.

    In Axelsson, the foreclosing creditor, who purchased the property at the foreclosure sale,

contended that the sale was free and clear of the easement, relying on cases holding that N.J.S.A.

§2A:50-30[24] "provides the purchaser at a foreclosure sale title free of any unrecorded interest . . .

---

[24]    N.J.S.A. §2A:50-30 provides:

> In any action for the foreclosure of a mortgage upon real or personal property in
> this state, all persons claiming an interest in or an encumbrance or lien upon such
> property, by or through any conveyance, mortgage, assignment, lien or any
> instrument which, by any provision of law, could be recorded, registered, entered
> or filed in any public office in this state, and which shall not be so recorded,
> registered, entered or filed at the time of the filing of the complaint in such
> action shall be bound by the proceedings in the action so far as such property is
> concerned, in the same manner as if he had been made a party to and appeared in
> such action, and the judgment therein had been made against him as one of the
> defendants therein; but such person, upon causing such conveyance, mortgage,
> assignment, lien, claim or other instrument to be recorded, registered, entered or
> filed as provided by law, may apply to be made a party to such action.

even if the purchaser at sale or the mortgagee at whose insistence the sale was held had notice of

the unrecorded interest." Id. at 1024 (citations omitted).  The holder of the easement argued that

none of the reported cases involved a mortgagee with knowledge of the unrecorded interest who

also was the purchaser at the foreclosure sale.  The Axelsson court agreed with the holder of the

easement, reasoning that "a purchasing mortgagee with knowledge should not emerge from a sale

in a better position with respect to an unrecorded interest than existed prior to the sale." Id. at

1025.  The court also stated:

> A foreclosing mortgagee who purchases is in a somewhat different situation than
> a purchasing stranger. The considerations militating in favor of protection of
> third-party purchasers simply do not apply to a purchasing mortgagee. If that
> mortgagee has knowledge of an unrecorded interest when it takes its mortgage, it
> is not entitled to protection. Indeed, the knowing mortgagee is specifically subject
> to the known unrecorded interest.

Id. at 1026 (emphasis added) (citation of N.J.S.A. §46:22-1 omitted).[25]

---

[25]      N.J.S.A. 46:22-1 provides:

> Every deed or instrument of the nature or description set forth in section 46:16-1
> of this title shall, until duly recorded or lodged for record in the office of the
> county recording officer in which the affected real estate or other property is
> situate, be void and of no effect against subsequent judgment creditors without
> notice, and against all subsequent bona fide purchasers and mortgagees for
> valuable consideration, not having notice thereof, whose deed shall have been
> first duly recorded or whose mortgage shall have been first duly recorded or
> registered; but any such deed or instrument shall be valid and operative, although
> not recorded, except as against such subsequent judgment creditors, purchasers
> and mortgagees.

(emphasis added).

**3.**

At first blush, application of the "first in time" principle appears to dictate the conclusion that Shay and Abbatiello, who were both the "foreclosing lienholders" and "sale purchasers," and who both had knowledge of the Debtor's leasehold interest in the Horses, took ownership at the sale subject to the Debtor's lease.  Consistent with Sullivan and Axelsson, a "keeper of a livery stable" who has actual knowledge of a third party's leasehold interest in a horse before providing services to the owner that give rise to a lien under N.J.S.A. 2A:44-51 and who conducts and purchases the horse at the lien sale, would take the horse subject to the rights of the lessee.  See generally Cattell v. Rehrer, 119 A. 374 (N.J. Ch. 1922) (citing Sullivan favorably and stating general rule that, while common-law liens attach to property without reference to ownership and override all other rights in property, a statutory lien is subordinate to all prior existing rights in property).

The foregoing analysis would be determinative if the leases in question were the original June 1, 2005 and July 23, 2005 leases between the Debtor and McCord Farms.  The record reflects, however, that after Shay and Abbatiello provided uncompensated services and after their respective statutory liens attached to the Horses, McCord Farms transferred the Horses to Highland.   McCord Farms and Highland could have structured the transfer in manner in which Highland's ownership was subject to the First Leases that were prior in time to Shay's and Abbatiello's statutory liens.  However, on October 31, 2006, Highland and the Debtor chose to replace the First Leases which with new leases, i.e., the Second Leases.

The critical facts in this case are that: (1) the Debtor's interests in the Horses derive from the Second Leases and (2) the Second Leases were subsequent in time and therefore, junior to the respective stableman's liens held by Shay and Abbatiello.  In these circumstances, I conclude

-24-

that, under applicable state law, the stableman's lien sales held on February 18, 2007 divested

both the lessor's ownership of and the Debtor's leasehold interests in the Horses.  See generally

Highland Lakes Country Club & Community Ass'n v. Franzino, 892 A.2d 646, 654 (N.J. 2006)

(any lien created by failure to pay condominium common assessments was extinguished by entry

of purchase money mortgagee's foreclosure judgment and subsequent sheriff's sale).  Because

the effect of the sales was to terminate property of the bankruptcy estate, i.e., the Debtor's

leasehold interests in the Horses  (and putting aside, for the moment, the legal principle that

actions taken in violation of the automatic stay are void, e.g., In re Siciliano, 13 F.3d 748, 750-51

(3d Cir. 1994)), the conduct of the stablemen's lien sales violated 11 U.S.C. §362(a)(3).[26]

---

[26]      The record reflects that the Debtor had notice of the Second Post-Sale Motions that Shay
and Abbatiello filed in state court on April 19, 2007 and, in fact, the Debtor appeared at the hearing in
opposition to the motions.  He was unsuccessful and the state court granted the motions.

          Once the second nunc pro tunc motions were filed, the issue before the state court was
whether the court could approve the stableman's lien sales nunc pro tunc, notwithstanding the fact that
the sale itself was conducted in violation of the automatic stay.  If the sales were void, only the
bankruptcy court could grant relief from the stay nunc pro tunc.  See Maritime Elec. Co., Inc. v. United
Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991); see generally In re Myers, 491 F.3d 120, 127 (3d Cir.
2007) (discussing circumstances in which automatic stay may annulled retroactively).  Nevertheless, the
state court entered an order approving the stableman's lien sales nunc pro tunc.  The order was entered
over the Debtor's opposition .  In these circumstances, a legitimate issue arises whether the Debtor is
bound by the determination of the state court under principles of collateral estoppel, even if state court's
determination was legally incorrect.  But see In re Dunbar, 245 F.3d 1058 (9th Cir. 2001) (after debtor
advised state licensing agency that automatic stay prevented agency from holding disciplinary hearings
and agency determined that automatic stay did not apply, bankruptcy court was not bound to accept
agency determination under principle of issue preclusion).

          Shay and Abbatiello have not argued in the alternative that even if the lien sales were
conducted in violation of the automatic stay, the Debtor is bound by the state court's nunc pro tunc,
approval of the sales.  Therefore, I consider the argument waived and express no opinion on its merits.

**4.**

Finally, because the Debtor focuses on Shay and Abbatiello's conduct following the February 20, 2007 lien sale – specifically, whether the filing of the First and the Second Post-Sale Motions independently violated the automatic stay – I briefly address the issue.  I conclude that the First Post-Sale Motions violated the stay, but the Second Post-Sale Motions did not.

Both sets of motions were an integral part of the lien sale process that divested Highland (and the Debtor) of their interests in the Horses.  Consequently, all of the conduct necessary to effectuate the sale served to exercise control over estate property in violation of 11 U.S.C. §362(a)(3).  This would include the post-sale legal proceedings necessary to confirm or approve the sale.

The Second Post-Sale Motions stand on a different legal footing from the first set of motions, however.  The Second Post-Sale Motions were filed more than 60 days after the order for relief in the Debtor's bankruptcy case and the Trustee did not assume the leases during that time period.  As a result, when the Second Post-Sale Motions were filed, the leases already had been rejected by the bankruptcy estate by operation of 11 U.S.C. §365(d)(1).[27]  Once rejected, the leases were no longer property of the bankruptcy estate and the automatic stay had terminated

---

[27]      Section 365(d)(1) provides:

> In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

-26-

with respect to the leases.  See 11 U.S.C. §365(p)(1).[28]  Therefore, the legal actions taken by

Shay and Abbatiello against Highland after the rejection of the leases would not, in and of

themselves, violate 11 U.S.C. §362(a)(3).


**5.**

The Debtor asserts that the violations of the automatic stay that occurred are actionable

under 11 U.S.C. §362(k).  I agree.

Section 362(k) provides:

> (1) Except as provided in paragraph (2), an individual injured by any <u>willful</u>
> <u>violation</u> of a stay provided by this section shall recover actual damages, including
> costs and attorneys' fees, and, in appropriate circumstances, may recover punitive
> damages.

> (2) If such violation is based on an action taken by an entity in the good faith
> belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of
> this subsection against such entity shall be limited to actual damages.

11 U.S.C. §362(k) (emphasis added).

Conduct that violates the automatic stay is willful if the creditor knew of the stay and if

the creditor's conduct that violated the automatic stay was intentional.  <u>Atl. Bus. & Cmty. Dev.</u>

<u>Corp.</u>, 901 F.2d at 329 (citing <u>In re Bloom</u>, 875 F.2d 224, 227 (9th Cir. 1989)); <u>accord</u> <u>Krystal</u>

<u>Cadillac</u>, 337 F.3d at 320 n. 8; <u>In re Univ. Med. Ctr.</u>, 973 F.2d 1065, 1088 (3d Cir. 1992).

Knowledge of the existence of the bankruptcy case is treated as knowledge of the automatic stay

---

[28]     Section 365(p)(1) provides:

> If a lease of personal property is rejected or not timely assumed by the trustee
> under subsection (d), the leased property is no longer property of the estate and
> the stay under section 362(a) is automatically terminated.

for these purposes.  See, e.g., In re Knaus, 889 F.2d 773, 775 (8th Cir. 1989); In re Johnston, 321

B.R. 262, 280 (D. Ariz. 2005); In re Ozenne, 337 B.R. 214, 220 (B.A.P. 9th Cir. 2006); In re

Welch, 296 B.R. 170, 172 (Bankr. C.D. Ill. 2003); In re Wagner, 74 B.R. 898, 904 (Bankr. E.D.

Pa. 1987).[29]  Significantly, the Third Circuit Court of Appeals has recognized that "willfulness"

under §362(k) does not require that the creditor have a "specific intent" to violate the stay.  E.g.,

Krystal Cadillac, 337 F.3d at 320 n.8; Atl. Bus. & Cmty. Dev. Corp., 901 F.2d at 329; see also In

re Johnson, 501 F.3d 1163, 1171-72 (10th Cir. 2007).

　　　　Here, there is no doubt that Abbatiello's violation of the stay was willful.  Both he and his

attorney, Pocaro, had actual notice of the bankruptcy filing.  Pocaro was aware that the Debtor

considered the lien sales to be stayed under §362(a).  Abbatiello chose to delegate to Pocaro the

decision whether to go forward and allow the sale to proceed.  That Pocaro's legal judgment

proved incorrect does not make Abbatiello's conduct any less intentional or "willful" within the

meaning of §362(k) and does not provide Abbatiello with a defense in this proceeding.

Abbatiello is bound by and responsible for the actions his counsel took on his behalf.[30]  In the

---

[29]　　　　Some courts have suggested that where the creditor received actual notice of the
automatic stay, courts should presume that the violation was deliberate.  Fleet Mortgage Group, Inc. v.
Kaneb, 196 F.3d 265, 268-69 (1st Cir. 1999); In re Spinner, 398 B.R. 84, 94 (Bankr. N.D. Ga. 2008).

[30]　　　　In Univ. Med. Ctr., 973 F.2d at 1088, the Court of Appeals recognized a limited
exception to the general standard described above for "willfulness" under §362(k), in its prior incarnation
as §362(h).  The court held that a violation of the automatic stay may not be "willful" if the creditor's
action was based on persuasive legal authority indicating that his or her actions do not violate the stay
and the law on the issue is sufficiently unsettled.  Id.  In In re Mu'min, 374 B.R. 149, 168-70 (Bankr.
E.D. Pa. 2007), I suggested that Univ. Med. Ctr. had been legislatively overruled by the 2005
amendments to the Bankruptcy Code, which codified, in §362(k)(2), an express good faith defense to
liability under §362(k) that is more limited than the good faith exception stated in Univ. Med. Ctr.  The
express statutory defense in §362(k)(2) requires a good faith belief that §362(h) applies.  Shay and
Abbatiello have never asserted a defense under §362(k)(2).

(continued...)

-28-

factual circumstances here, Abbatiello was sufficiently involved in the stableman's lien sale, with

notice of the bankruptcy filing, to justify the finding that he violated the automatic stay

"willfully" under 11 U.S.C. §362(k).  Cf. In re Rhyne, 59 B.R. 276, 279 (Bankr. E.D. Pa. 1986)

(relief denied in absence of evidence that creditor directed counsel to take actions that violated

stay or even knew of it).

Shay's situation differs somewhat.  Both he and Pocaro testified that Pocaro did not

advise him of the Debtor's bankruptcy filing prior to the February 18, 2007 stableman's lien sale

of Mac's Derrick T and Mac Only VP.  I credit their testimony on this point.  However, I also

infer from the evidence that prior to February 18, 2007, Shay had granted Pocaro broad discretion

in determining how to obtain payment of the Debtor's unpaid bill.  Pocaro opted to seek

enforcement of Shay's statutory lien against the two horses and proceeded with the stableman's

lien sale with full knowledge of the bankruptcy filing.  In these circumstances, involving the

actions taken by an attorney on behalf of a client, I find it appropriate to follow those reported

decisions that apply general principles of agency law and hold that a creditor-principal is liable

---

[30](...continued)
        Even if the more general good faith defense articulated in Univ. Med. Ctr. remains good
law, the result is the same, i.e., Abbatiello has no good faith defense.  While the principles expressed in
the Second Circuit's decision in 48th Street Steakhouse may not be universally recognized by all courts, it
is also true that they have not been the subject of any robust judicial debate.  Therefore, I conclude that
the principles are not sufficiently unsettled to support a good faith defense to liability.

        After the Debtor's counsel and Pocaro debated the scope of the automatic stay in the
their telephone conversation on the day the bankruptcy case was filed, Shay and Abbatiello could have
resolved their disagreement with the Debtor by filing a motion seeking clarification of the scope of the
automatic stay or modification of the automatic stay.  See In re Daniels, 316 B.R. 342, 352-53 (Bankr. D.
Idaho 2004); In re Peterkin, 102 B.R. 50, 53-54 (Bankr. E.D.N.C. 1989); see also In re Fidelity American
Mortgage Co., 19 B.R. 568 (Bankr. E.D. Pa. 1982).  By proceeding against the Horses in the face of legal
uncertainty, Shay and Abbatiello "acted at their own peril."  Allentown Ambassadors, 361 B.R. at 459.
"Consequences attend that decision."  Daniels, 316 B.R. at 353.

under §362(k) for the acts of an agent who willfully violates the automatic stay taken when those

acts are within the scope of their principal-agent relationship.[31]  See In re Crawford, 388 B.R.

506, 519-20 (Bankr. S.D.N.Y. 2008); see also In re Taylor, 430 B.R. 305, 314 (Bankr. N.D. Ga.

2010); In re Kline, 420 B.R. 541, 548 (Bankr. D.N.M. 2009); In re Bishop, 296 B.R. 890, 894-95

(Bankr. S.D. Ga. 2003). But see In re Atlas Mach. & Iron Works, Inc., 239 B.R. 322, 333-35

(Bankr. E.D. Va. 1998); In re Hooker Investments, Inc., 116 B.R. 375, 383 (Bankr. S.D.N.Y.

1990); Rhyne, 59 B.R. at 279.


### B.  The Debtor's Claims Against Gaitway and Showplace

Finally, I address the Debtor's claims against Gaitway and Showplace.


### 1.

During the Debtor's case-in-chief, the evidence suggested that Gaitway's only connection

to the stableman's lien sale of Mac's Emily BJ was that Gaitway was the site of the sale.  While

Gaitway was a creditor of the Debtor and a statutory lienholder with respect to Mac's Emily BJ,

the Debtor presented no evidence that Gaitway took any action to enforce its lien after the

commencement of the Debtor's bankruptcy case in this court.  All of the post-petition lien

enforcement actions were taken by Abbatiello.

Gaitway moved for judgment on partial findings under Fed. R. Civ. P. 52(c) at the close

of the Debtor's case-in-chief.  Rule 52(c) permits a court to grant judgment upon motion or sua

---

[31]     To the extent that the imposition of liability on the creditor under §362(k) is due to
improper attorney conduct, the creditor may be able to look to the attorney for compensation.

sponte "at any time during a bench trial, so long as the party against whom judgment is to be

rendered has been 'fully heard' with respect to an issue essential to that party's case." EBC, Inc.

v. Clark Bldg. Systems, Inc., 618 F.3d 253, 272 (3d Cir. 2010).  In considering whether to grant

judgment under Rule 52(c), the trial court applies the same standard of proof and weighs the

evidence as it would at the conclusion of the trial and may make determinations of witness

credibility where appropriate.  "Accordingly, the court does not view the evidence through a

particular lens or draw inferences favorable to either party."  Id.

   In response to Gaitway's Rule 52(c) motion, the Debtor asked me to infer from the

evidence that Gaitway and Abbatiello were acting in concert to effectuate the stableman's lien

sale in violation of the automatic stay. Because I considered the suggested inference to be

nothing more than mere speculation, I declined to draw  the requested inference, as was my

prerogative as the finder of fact.

   The Debtor also suggested that I defer granting judgment because the record generated

during the defense portion of the trial might establish the requisite connection between Gaitway

and Abbatiello sufficient to establish liability under 11 U.S.C. §362(k).  I declined that request as

well.  The Debtor bore the burden of proof against Gaitway, was obliged to meet that burden in

his case-in-chief and had not met that burden.

   In this Opinion, I reaffirm my prior decision that Gaitway was entitled to the entry of

judgment at the conclusion of the Debtor's case-in-chief.  Based on the record as it existed at that

time, I concluded that the Debtor presented no evidence that Gaitway took any action to willfully

violate the automatic stay.  Nothing in the evidence presented after the conclusion of the Debtor's

case-in-chief and the dismissal of his claim against Gaitway causes me to question that

determination.[32]

## 2.

The Debtor asserts two legal theories in support of his claim against Showplace.

First, much like his claim against Gaitway, the Debtor claims that Shay and Showplace acted in concert to conduct the stableman's lien sale of Mac's Derrick T and Mac Only VP in violation of the automatic stay. Again, the Debtor presented no evidence that established that Showplace took any action after the commencement of the Debtor's bankruptcy case to enforce a claim against the Debtor or to enforce its statutory lien against the horses. All of the post-petition collection actions were taken by Shay.

Second, the Debtor asserts that on February 20, 2007, two days after the lien sale, he went to Showplace to take possession of the two horses, but was prevented from doing so by Showplace representatives. The Debtor's sole evidence in support of this theory was his own testimony.

Similar to Gaitway, Showplace moved for judgment on partial findings under Rule 52 at the close of the Debtor's case-in-chief. In requesting the entry of judgment in its favor,

---

[32]     There was some additional evidence introduced by the defense after the Debtor's claims against Gaitway were dismissed that related to the stableman's lien sale of Mac's Emily BJ on February 18, 2007. That evidence was in the form of Abbatiello's testimony. Abbatiello explained that some time prior to the lien sale, he removed the horse from Gaitway and transported it to his father's farm nearby. Because he was aware that the lien sale notice advertised that the sale would take place at Gaitway, he brought the horse to Gaitway on February 18, 2007, just long enough for Pocaro to conduct the sale. Abbatiello then took the horse back to his father's farm.

        This additional evidence provided more detail regarding the sale. It provided no support for the Debtor's theory to impute Abbatiello's conduct to Gaitway.

Showplace asserted that the Debtor's account of his efforts to retrieve the horses on February 20,

2007 was fictitious and that I should decline to credit his testimony.  Exercising the discretion

afforded under Rule 52(c), I denied Showplace's motion because I did not find the Debtor's

testimony regarding so unworthy of belief as to make it unnecessary for Showplace to present

evidence.

Now, with the benefit of the conflicting evidence from both sides regarding the Debtor's

allegations that Showplace prevented him from taking possession of Mac's Derrick T and Mac

Only VP on February 20, 2007, I have resolved that conflict in favor of Showplace.  See n.11,

supra.  I have found that Showplace did not interfere with any right the Debtor may have had to

take possession of the two horses.  It follows that Showplace did not take any action to possess or

control property of the bankruptcy estate and therefore, Showplace did not violate the automatic

stay.[33]

## VI.

For the reasons set forth above, I have determined that Shay and Abbatiello violated 11

U.S.C. §362(a)(3) and that Showplace and Gaitway have not violated the automatic stay.

Therefore, I will hold enter judgment in the Debtor's favor against Shay and Abbatiello, conduct

a damages hearing on the Debtor's successful claims and enter judgment in favor of Showplace

---

[33]    Had I credited the Debtor's testimony, it might have supported his claim that Showplace
violated 11 U.S.C. §362(a)(3) by interfering with a right of possession of the two horses.  See U.S. v.
Whiting Pools, 462 U.S. 198 (1983); In re Mwangi, 432 B.R. 812, 822-23 (B.A.P. 9th Cir. 2010) (chapter
7 debtor is entitled to possession of property of the estate that has been claimed as exempt and may assert
a claim for violation of 11 U.S.C. §362(a)(3)).  But see In re Young, 439 B.R. 211, 217-18 (Bankr. M.D.
Fla. 2010) (rejecting and declining to follow Mwangi); In re Bucchino, 439 B.R. 761 (Bankr. D. N.M.
2010) (same).  Because of the factual findings I have made, I do not reach this legal issue.

and Gaitway and against the Debtor.

An order consistent with this Opinion will be entered.

**Date:**  **February 14, 2011**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**