## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 7** |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| Debtor. | : | **Bky. No. 07-11008 ELF** |
| | : | |
| **RAFAIL THEOKARY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **ERIC ABBATIELLO, et al.,** | : | **Adv. No. 09-051** |
| | : | |
| Defendants. | : | |

# O P I N I O N

## I.  INTRODUCTION

Plaintiff-Debtor Rafail Theokary ("the Debtor") filed a chapter 7 bankruptcy case on February 16, 2007.  At the time, he held a leasehold interest in three (3) standardbred race horses (when referred to collectively, "the Horses").  Two (2) days after the commencement of this bankruptcy case, and with notice of the bankruptcy filing, creditors Defendants Eric Abbatiello ("Abbatiello") and Tom Shay ("Shay") enforced their respective statutory liens against the Horses by conducting stableman's lien sales of the Horses.  See N.J.S.A. §§2A:44-51 to 2A:44-52.

In this adversary proceeding, the Debtor asserts that Abbatiello and Shay, along with Showplace Farms ("Showplace") and Gaitway Farms, Inc. ("Gaitway"), willfully violated the

automatic stay, 11 U.S.C. §362(a).  The Debtor seeks monetary damages from the Defendants.

See 11 U.S.C. §362(k).

Trial of the liability issues was bifurcated from the damages phase.  After conclusion of

the liability trial and briefing by the parties, I issued an opinion and order in which I determined

that Defendants Abbatiello and Shay willfully violated the automatic stay, but that Defendants

Showplace and Gaitway had not.  See In re Theokary, 444 B.R. 306, 315 (Bankr. E.D. Pa. 2011)

("Theokary I").[1]  Shortly thereafter, I entered a pretrial order in which I permitted the parties to

engage in additional discovery and scheduled the trial on damages with respect to the remaining

Defendants (i.e., Abbatiello and Shay, hereafter "the Defendants").  (Doc. # 183).

During the post-liability discovery phase of the proceeding, the Debtor retained Samuel

Paparo ("Paparo") to testify as an expert witness regarding the damages the Debtor allegedly

suffered by losing his leasehold interest in the Horses.  After the Debtor's counsel delivered to

Defendants' counsel a copy of Paparo's expert report, the Defendants filed a motion in limine

and to dismiss ("the Motion"), in which they disputed the bona fides of Paparo purported

authorship of the expert report and requested that the court: (1) bar Paparo from testifying as an

expert witness; and (2) dismiss the adversary proceeding on the ground that the Debtor could not

prove his alleged damages without an expert.  (Doc. # 210).  I consolidated the hearing on the

Motion with the previously scheduled damages trial.  (Doc. # 213).

Trial of these matters was held over parts of five (5) days:  June 13, 2011, June 14, 2011,

---

[1]    After considering motions for reconsideration filed by both sides, I issued an order that
amended certain findings of fact.  See 460 B.R. 418 (Bankr. E.D. Pa. 2011) ("Theokary II").  Those
changes are not material to the issues presently before the court.

July 12, 2011, July 19, 2011 and July 25, 2011.[2]  During the course of the trial, the Defendants

refined their theory underlying the Motion, ultimately asserting that the Debtor "ghost-wrote" the

Paparo expert report, plagiarizing it from the parties' joint pretrial statement filed in September

2009 and asserting that this misconduct warranted the sanction of dismissal of the adversary

proceeding.

On the final day of trial, the Debtor moved to discharge his counsel.  (5 N.T. at 75-76).[3]  I

granted that motion effective upon the completion of the Debtor's testimony as the first witness

called (as of cross-examination) in the Defendants' case-in-chief.  (5 N.T. at 80-85).  Since then,

the Debtor has proceeded pro se.

Post-trial briefing concluded on September 29, 2011.

As explained below, I conclude that the Debtor did, in fact, manufacture evidence in an

attempt to commit a fraud upon the court[4] and that the Debtor's conduct warrants dismissal of

this adversary proceeding based upon the exercise of this court's "inherent power."

---

[2]    In this Opinion, I will cite to the notes of testimony by referring to the five (5) days of
trial, rather than to the specific trial date.  For example, I will cite the June 13, 2011 notes of testimony as
"1 N.T."

[3]    At the beginning of the trial, the Debtor also requested leave to dismiss his attorneys and
proceed pro se.  However, after some reflection, he withdrew that request.  (1 N.T. at 6-9).

[4]        A "fraud on the court" occurs where it can be demonstrated, clearly and
convincingly, that a party has sentiently set in motion some unconscionable
scheme calculated to interfere with the judicial system's ability impartially to
adjudicate a matter by improperly influencing the trier or unfairly hampering the
presentation of the opposing party's claim or defense.

Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).

## II.  FINDINGS OF FACT

The factual background of the conduct giving rise to this adversary proceeding was set forth in the detailed findings of fact made in Theokary I and Theokary II.  Those earlier factual findings are incorporated by reference and will not be repeated here.  Because the Motion is based on allegations of misconduct in these proceedings, my present factual findings focus on events that occurred during the course of the litigation itself, rather than on the merits of the dispute regarding the amount, if any, of actual damages that the Debtor may have suffered as a result of the Defendants' violation of the automatic stay.

My findings of fact in connection with the Motion are set forth below.[5]

### events prior to the November, 2009 liability trial

1.  From June 2009 until July 2011, Kenneth Sandler ("Sandler") was the Debtor's lead counsel and Michael J. Rutenberg ("Rutenberg") served as "second chair" in this adversary proceeding.

2.  On September 9, 2009, Sandler and Rutenberg, on the Debtor's behalf, and Jeffrey R.

---

[5]    These Findings of Fact contain my resolution of the facts material to my legal conclusions.  To make these findings, I have resolved conflicts in the evidence presented by the parties. In doing so, I have considered the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.  Where it would provide context, I have set forth in footnotes additional observations and analysis of the evidence presented.  In addition, I have drafted a separate section analyzing the evidence and explaining how and why I resolved certain material factual disputes.  Where appropriate, the footnotes and the separate section of this Opinion analyzing the evidence should be considered additional findings of fact.

Pocaro ("Pocaro") and Howard Taylor,[6] on the Defendants' behalf, filed a Joint Pretrial

Statement ("the JPS").  (Doc. # 87).

3.    In the JPS, the Debtor identified Antonius Kimbrough ("Kimbrough") as his only expert

witness at trial.  (JPS at 37).[7]

4.    At pages 10-11 of the JPS, the Debtor itemized his alleged damages ("the JPS Damages

Section").  (See Doc. #87) (attached as Appendix I to this Opinion).

5.    Concisely summarized, in the JPS Damages Section, the Debtor asserted an entitlement to

more than $1 million in actual damages (exclusive of punitive damages and counsel fees) as

follows:

  a.  $15,000.00, representing twenty percent (20%) of the aggregate value
      ($75,000.00) of the Horses;

  b.  $117,080.00 in lost racing earnings through the end of the Debtor's lease on
      December 31, 2011;[8]

---

[6]    Subsequently, the court granted Taylor's request to withdraw as counsel, leaving Pocaro
as the Defendants' sole attorney.


[7]    The Debtor does not deny the Defendants' contention that he failed to provide them with
a copy of Kimbrough's expert report in the discovery period prior to the filing of the JPS, as required by
Paragraph 6.a. of the court's Pre-Trial Order.  (Doc. # 13).


[8]    By their terms, the Debtor's leases for all three (3) of the Horses terminated on
December 31, 2011.  See Theokary I, 444 B.R. at 313 (Finding of Fact No. 30).

    The Debtor calculated his damages for lost racing earnings of $117,080 as follows:

      (1) anticipated revenues of $131,861 (Macs Derrick T), $23,535 (Mac Only VP)
          and $131,861 (Macs Emily BJ), which totals $287,257;

      (2) minus expenses of $120,000, resulting in net revenue of $167,257;

      (3) multiplied by 70%, representing the Debtor's share under the lease.
                                                              (continued...)

     c.   $917,000.00 in lost revenue for breeding the Horses;[9]

     d.   $11,000.00 in accessories and equipment.

6.   On the Debtor's behalf, Rutenberg drafted the JPS Damages Section.  (3 N.T. at 10, 24, 56).

7.   Rutenberg based the content of the JPS Damages Section on information provided to him:

     a.   in one (1) or more telephone conversations he had, prior to September 9, 2009, with the Debtor and Stan Guest ("Guest"),[10] (4 N.T. at 58); and

     b.   by Guest, in written memorandum form ("the Guest Memorandum") (Ex. T-11).

8.   The JPS Damages Section is organized in the same manner as the Guest Memorandum, setting forth the same "initial" $75,000.00 value of the three (3) Horses, followed by a damages calculation based on projected lost race earnings and lost breeding revenue. Several of the racing and breeding damages calculations in the two (2) documents are identical.

9.   The JPS Damages Section includes a blatantly erroneous factual assumption in calculating the lost breeding revenue attributable to two (2) of the Horses (the mares), i.e., that each

---

[8](...continued)

[9]     The Debtor calculated his damages of $917,000.00 for lost breeding revenue as follows:

     (1)  $1,350,000 in gross revenue minus $40,000 in expenses, which equals $1,310,000;

     (2)  multiplied by 70%, pursuant to the leases.

[10]     Guest is an authorized representative of the Highland Group, the entity that leased the Horses to the Debtor.  See Theokary I, 444 B.R. at 313 n.14.  On page 35 of the JPS, Guest was identified by the Debtor as a proposed lay witness with valuation knowledge.

mare would bear seven (7) foals <u>per year</u> in a five (5) year period.[11]  (Doc. #87 at 11).

10.  The likely source of this error was Rutenberg's failure to correctly transpose certain

information from the Guest Memorandum to the JPS Damages Section.[12]

11.  Paparo did not participate or contribute in any material way to Rutenberg's drafting of the

JPS Damages Section and was not identified as a potential expert witness in the JPS.[13]

12.  Paparo first became actively involved in this litigation on September 27, 2009, a few weeks

after the JPS was filed.  On that date, Rutenberg met with the Debtor and Paparo to discuss

Paparo's possible retention as an expert witness.[14]  (2 N.T. at 21).[15]

13.  Following this meeting, Rutenberg sent a letter to Paparo dated October 7, 2009 ("the

Rutenberg Letter").  (Ex. DD-16).

14.  In the Rutenberg Letter, Rutenberg:

    a.  advised Paparo that he (Rutenberg) believed that the Debtor's damages consisted

---

[11]    The parties agree that, because a horse's gestation period is eleven (11) months, no horse can have seven (7) foals per year, much less thirty-five (35) foals over five (5) years.

[12]    I draw this inference after comparing the two documents.  The Guest Memorandum calculates damages based on the loss of revenue from seven (7) foals per horse.  For some reason, Rutenberg transposed this calculation into seven (7) foals per horse, <u>per year</u>.

[13]    This Finding of Fact, as well as Findings of Fact Nos. 12-16 and 46-49, are material to the outcome in this proceeding and are discussed in detail in Part III.A, below.

[14]    The record does not reveal why the Debtor listed Kimbrough as his expert witness in the JPS in 2009, only to seek out Paparo a few weeks later for the same purpose.

[15]    Based on my recollection of the trial, the page of transcript cited in the text incorrectly attributes the statements at lines 11-14 to Pocaro and lines 15-16 to the court.  The attributions should be reversed.

of three (3) elements: (a) the "value" of the horses; (b) the lost racing revenue; and (c) the lost breeding revenue – the same analytic structure set forth in the Guest Memorandum and the JPS Damages Section;

b.   provided Paparo with Guest's $75,000.00 valuation of the Horses;

c.   set forth much of the same data used to calculate the lost racing and breeding revenues contained in the Guest Memorandum and the JPS Damages Section; and

d.   concluded by requesting that Paparo provide a resume and "an expert's report."

15.   Approximately two weeks after the September 27, 2009 meeting among the Debtor, Paparo and Rutenberg, Paparo advised Rutenberg that he was not willing to serve as an expert witness.  (3 N.T. at 55).

16.   At no time in 2009 did Paparo prepare a written expert report on the subject of damages.[16]

**events occurring after the 2009 liability trial and prior to the 2011 damages trial**

17.   On February 14, 2011, the court issued its liability decision in <u>Theokary I</u>.

---

[16]      This was a hotly contested factual issue at trial.  The Debtor maintained that Paparo played an active role in Rutenberg's drafting of the JPS Damages Section and, in fact, that Paparo drafted his own "report" at some point in 2009.  Presumably, the Debtor took this position because the existence of a 2009 report would support the Debtor's contention that Paparo wrote the original and amended expert reports submitted prior to the damages trial in 2011.

After considering the Guest Memorandum and the Rutenberg Letter, I find the Debtor's position on this point untenable.  The Guest Memorandum demonstrates that Guest was the primary author of the damages analysis presented by the Debtor in both 2009 and 2011.  The Rutenberg Letter strongly supports this conclusion.  It just is not the type of letter that an attorney would write to an expert who had already provided essential details of his or her expected opinion testimony.  Putting it in its best light, it reads like a letter written by an attorney who was providing a new, prospective expert with information that the attorney accumulated from other sources, accompanied by a request that the expert use that information to develop his own opinion, to be set out in his own report.  One could also read the letter more cynically, as telling a new, proposed expert exactly what conclusions the attorney expected the expert to state in his report.  Either way, it is not possible to read the Rutenberg Letter and conclude that Paparo already had prepared an expert report – or already had communicated to Rutenberg the substance of the damages analysis that was set out in the JPS Damages Section.

18.   Following a pretrial conference held on March 10, 2011, the court entered an order (the

"Amended Pre-Trial Order") (Doc. # 183), which, <u>inter alia</u>:

     (a) extended certain expired discovery deadlines to permit the parties to identify
     expert witnesses and conduct expert witness discovery;[17] and

     (b) set a trial date.

19.   On April 21, 2011, the day before the deadline for the Debtor to comply with the expert

witness disclosure requirements set forth in Fed. R. Civ. P. 26(a)(2)(A) and (B) and

provided by the Amended Pre-Trial Order, the Debtor delivered to his counsel, Sandler, an

expert report on which the expert's signature was redacted ("the Redacted Report").

(Debtor's Certification ¶¶21-23) (Doc. #194-3).  The Debtor also delivered the expert's

curriculum vitae with all of the expert's personal identifying information, including the

expert's name, redacted ("the Redacted CV").  (Ex. DD-10; Ex. DD-14).

20.   On April 21, 2011, Sandler served the Defendants' counsel with the Redacted Report and

the Redacted CV.  (Debtor's Certification ¶23) (Doc. # 194-2).

21.   The next day, April 22, 2011, the Debtor filed a Motion for Protective Order (Doc. # 194) in

which he asserted that he had a reasonable basis for being concerned that the Defendants or

their counsel would apply undue influence or pressure on any expert he might retain and

requested that the court enter a protective order:

     a.   limiting disclosure of the expert's identity to the Defendants and the professionals
        assisting them in this litigation; and

---

[17]     In the interest of justice and the strong policy embedded in the court rules in favor of
deciding cases on their merits, I extended the deadline for the Debtor to obtain an expert and provide the
Defendants with a copy of an expert report, even though the Debtor did not present any compelling
reason for his failure to do so earlier (as required by the first Pre-Trial Order).

     b.   prohibiting the Defendants and their counsel from communicating with the expert, except at a pretrial deposition and trial.

22.   Although Sandler filed the Motion for a Protective Order, <u>Sandler himself did not know at that time the identity of the expert who provided the Redacted Report and the Redacted CV</u> that he served on the Defendants' counsel.  (3 N.T. at 34).

23.   Paparo was the proposed expert witness whose name was blacked out from the Redacted CV and the Redacted Report.

24.   On April 29, 2011, the court denied the Debtor's Motion for Protective Order and directed the Debtor to produce unredacted copies of the expert report ("the Unredacted Report") and the CV ("the Unredacted CV") by May 9, 2011.  (Doc. # 198).

25.   Some time between April 29, 2011 and May 13, 2011, Pocaro learned that Paparo was the Debtor's proposed expert witness.[18]

26.   On May 13, 2011, at the joint request of the parties' counsel, Sandler and Pocaro, the court conducted an on-the-record telephone conference.

27.   During the May 13, 2011 telephone conference, Pocaro expressed his concern about the authenticity of the Unredacted Report, allegedly authored by Paparo, because of its striking similarity to the JPS Damages Section, filed in September 2009.  To assist him in exploring that subject at a deposition of Paparo scheduled on May 19, 2011, Paparo requested that, prior to the deposition, the Debtor be required to produce the Unredacted CV and the Unredacted Report in electronic form on a CD, floppy disk or e-mail attachment, in their

---

[18]    The record does not reflect exactly when Sandler revealed to Pocaro that Paparo was the expert, but Pocaro was aware of that fact when the parties requested the May 13, 2011 telephone conference, referred to in Finding of Fact No. 26.

original, word processing format.[19]

28. At the conclusion of the May 13, 2011 telephone conference, the court stated that it would

grant the Defendants' request.  The court orally directed Sandler to instruct Paparo to

provide Pocaro with the Unredacted Report in its original electronic document form

forthwith, without waiting for the entry of a written order.

29.  On May 19, 2011,[20] consistent with its oral direction to Debtor's counsel , the court entered

an order (Doc. # 207), which provided:

> The Plaintiff's expert witness Sammy Paparo will copy from his computer files, in
> Word document format, and transmit by floppy disc, CD or email . . .  his curriculum
> vitae and expert report prior to the taking of his deposition on May 19, 2011.

(emphasis omitted).

30. The similarities between the Unredacted Report, allegedly prepared in 2011, and the JPS

Damages Section, filed with the court in 2009, that stand out most starkly are that the

Unredacted Report:

a.  repeats the biologically erroneous statement in the JPS Damages Section that two
of the Horses (the mares) would each have seven (7) foals per year in the five (5)
year period; and

b.  calculates the damages claimed for the lost breeding revenue in a nearly identical
manner to the analysis in the JPS Damages Section.

_____

[19]      Pocaro believed that if he received the original "Word" document, his examination of the
"metadata" would enable him to determine when the document was prepared and whether it was prepared
on Paparo's computer or, as he suspected, on the Debtor's computer.  In any event, he asserted that the
information would assist him in the Paparo deposition.

[20]      In the May 13, 2011 telephone hearing, the court gave counsel a few days to submit a
joint form of order or, if no agreement could be reached, competing proposed orders.  They could not
agree and, instead, submitted competing proposed orders.  (Doc. #'s 205, 206).  This explains the lag
time between the telephone hearing and the entry of the court's order.

Compare Doc. #87 at 10-11, with Ex. DD-10.

31. In addition, both the JPS Damages Section and the Unredacted Report:

    a. place an initial value of $75,000.00 on the three (3) Horses;

    b. project the same lost earnings for the Horses (although the JPS Damages Section has an arithmetic error that was corrected in the Unredacted Report);

    c. project the same expenses for the Horses;

    d. project the same breeding revenues and expenses; and

    e. erroneously depict Macs Derrick T as having a "brother" or "half-brother" earning $3,000.00 per session for stud service.[21]

32. At some point after he received either the Redacted or the Unredacted Report, Pocaro had a conversation with Sandler in which Pocaro pointed out the error regarding the number of foals the two (2) mares could bear in a five (5) year period. After that conversation, Sandler spoke with the Debtor about the error. (3 N.T. at 21).

33. Pocaro took Paparo's deposition on May 19, 2011. (Ex. DD-1) (hereafter the "Paparo Deposition").

34. Just prior to the commencement of the Paparo Deposition, Paparo handed Pocaro a CD, which contained an amended version of the Unredacted Report ("the Amended Unredacted

---

[21]    The JPS Damages Section refers to Macs Derrick T as having a "brother" (without mentioning the brother by name) who earns $3,000.00 per session for stud service. This statement appears to be derived from the Guest Memorandum, which identifies All American Ingot (who earns $3,000.00 per session for stud service) as Macs Derrick T's "half-brother." The Unredacted Report also states that All American Ingot earns $3,000.00 per session for stud service and is Macs Derrick T's "half-brother." Robert Boni, the Defendants' expert, testified unequivocally at trial that the term "half-brother" is a term of art in the horse racing industry, referring only to step-brothers who share a common mother and that All American Ingot is not Macs Derrick T's half-brother. (1 N.T. at 143, 145-7). During his voir dire, Paparo conceded that Mr. Boni was correct and that the two horses, in fact, are not half-brothers. (2 N.T. at 33).

Report") (Ex. PD-17).[22]  (See Paparo Deposition at 4-6).

35.  The electronic version of the Amended Unredacted Report given to Pocaro was in pdf

format, not Word or other word processing format.  (1 N.T. at 279-81).

36.  The CD provided to Pocaro at the Paparo Deposition was created by a Staples store

employee, who scanned in a hard copy of the Amended Unredacted Report provided by

Paparo.[23] (1 N.T. at 283-86).

37.  The Amended Unredacted Report corrected the blatant error described above in Finding of

Fact No. 30 and projects loss of breeding revenue based on four (4) foals for each of the

mares over a five (5) year period, instead of the seven (7) foals per year as stated in the

original Unredacted Report.

38.  On May 24, 2011, the Defendants filed the Motion.

39.  By Order dated May 25, 2011, the court deferred consideration of the Motion until the

damages trial.  (Doc. # 213).

40.  At no time prior to the trial did Sandler compare the Unredacted Report or the Amended

Unredacted Report to the JPS Damages Section or notice the similarities between them.  (3

---

[22]    During the trial, hard copies of Paparo's Unredacted CV (Ex. PD-16) and the Amended Unredacted Report (Ex. PD-17) were marked for identification as exhibits in connection with Paparo's voir dire.  (1 N.T. at 219-20; 267).  Ex. PD-17 was also marked as Ex. DD-8.  (1 N.T. at 267).

[23]    Paparo has consistently maintained that his expert report was typed on a computer.  At trial, he testified that he wrote the report out longhand and read it to an individual named Richard Anderson, who typed the report on a computer. (1 N.T. at 282-84).  Assuming that Paparo's testimony was truthful, unless the original electronic document was "deleted" from Anderson's computer (and there was no testimony suggesting that it was), Paparo should have been able to comply with the court's May 19, 2011 order and provide Pocaro with an electronic document in a word processing format.  By providing only a "scanned-in," pdf version of a different document (the Amended Unredacted Report), Paparo prevented the lay forensic computer investigation Pocaro wished to conduct.

N.T. at 27).

### the 2011 damages trial and hearing on the Motion

41. The damages trial commenced on June 13, 2011.

42. On the first day of trial, in order to accommodate the schedule of Robert Boni ("Mr. Boni"),

    the defense's expert, the court allowed the Defendants to interrupt the Debtor's case-in-chief

    and call Mr. Boni as a witness out of sequence.

43. Mr. Boni was qualified as an expert appraiser of standardbred horses.  (1 N.T. at 124).

44. Mr. Boni opined that the three (3) Horses had an aggregate value of $4,000.00 as of

    February 17, 2007, when the Horses were sold at the stableman's lien sale for $100.00 each.

    (1 N.T. at 130, 136, 139; Ex. DD-3).[24]

45. At trial, the Debtor called Paparo to testify as an expert witness.

---

[24]    Specifically, Mr. Boni appraised Mac's Emily BJ at $500.00, Mac Only VP at $1,000.00
and Mac's Derrick T at $2,500.00.  (1 N.T. at 130, 136, 139).  In forming his opinion, Mr. Boni used
what appeared to be a "sales" approach to valuation, testifying that the best method of appraising value is
to predict what price the Horses would bring at a public horse auction, a process based largely on
consideration of a horse's genealogy.  (1 N.T. at 127-28, 166, 183-84, 192-93).  There was some
evidence presented, later in the trial, that Mr. Boni's valuation may have been too low. Shay testified that
six (6) months after purchasing Mac's Derrick T at the stableman's lien sale, he sold the horse for
$15,000.00 in a "claiming race."  (2 N.T. at 94).  He attributed the higher value to the training and racing
success the horse had during that six (6) month period.  (2 N.T. at 102-104).   (Although I make no
findings on valuation, I discuss the issue  again, briefly, in Part V.B.6, infra).

        I further note that at the time of the stableman's lien sale the Horses that the Defendants
assert were worth $4,000.00 (and the Debtor asserts were worth much more), were encumbered by
stableman's liens in favor of Defendants Abbatiello and Shay totaling approximately $33,000.00-
$34,000.00 ($15,000.00 owed to Shay and $18,000.00-19,000.00 owed to Abbatiello).  (2 N.T. at 106; 5
N.T. at 111).  Consequently, the Defendants contend that the Debtor suffered no economic harm (i.e., no
actual damages) as a result of the violation of the automatic stay.  Because I decide this matter on other
grounds, I do not reach that issue.

46.  After a lengthy voir dire, the court determined that Paparo was not qualified to testify as an

expert witness and excluded his proposed testimony.  (2 N.T. at 54-61).[25]

47.  Paparo did not author the Unredacted Report or the Amended Unredacted Report (hereafter

collectively, "the 2 Reports").

48.  The Debtor prepared the 2 Reports by plagiarizing the JPS Damages Section and, knowing

that the content of the 2 Reports was not Paparo's work product, attempted to pass off the 2

Reports as Paparo's work product.

49.  The Debtor attempted to commit a fraud upon the court by knowingly and in bad faith

offering this evidence under false pretenses.

---

[25]     Pursuant to Fed. R. Evid. 702, courts engage in a three (3) step analysis in determining
whether to accept into evidence the testimony of a proposed expert witness.  Although the test is
frequently stated in slightly different terms, under Rule 702, the court must consider whether: (1) the
subject of the testimony involves specialized knowledge that will assist the trier of fact; (2) the witness
has sufficient knowledge, skill and training to be considered an expert in the relevant field; and (3) the
witness has applied a methodology or technique that has sufficient indicia of reliability.  See, e.g., In re
Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994); McGarrigle v. Mercury Marine, 2011
WL 6371177, at *4-9 (D.N.J. Dec. 20, 2011).

         After the voir dire concluded, I determined that Paparo's proposed expert testimony did
not satisfy either the second or third requirements stated above.  While Paparo has extensive experience
in certain aspects of the race horse industry, he exaggerated his credentials on his CV and, in fact, has
little experience in the field of valuation.  Consequently, Paparo was not qualified to offer expert
valuation testimony.  I also concluded that even if he had the necessary expertise, Paparo had applied no
peer-accepted methodology in support of the opinions he proposed to offer.  Rather, even though he
purported to base his opinion on certain objective data, because he was unable to explain how he
employed the data he purportedly relied upon in forming his opinion, Paparo's valuation of the Horses
represented nothing more than an "educated hunch" that may not be passed off as expert testimony.  See,
e.g., Wilson v. City of Lafayette, 2010 WL 728336, at *8 (D. Colo. Feb. 25, 2010) (quoting Warren v.
Tastove, 240 F. App'x 771, 773 (10th Cir. 2007) (nonprecedential)); see also Klaczak v. Consol. Med.
Transp. 458 F. Supp. 2d 622, 667 (N.D. Ill. 2006).  Finally, because Paparo could provide no explanation
as to why the original Unredacted Report and the Amended Unredacted Report, purportedly prepared in
2009, were almost identical to the JPS prepared in September 2009, I found him not to be a credible
witness, generally.

# III.  ANALYSIS OF THE EVIDENCE

## A.  The 2 Reports were Plagiarized

As set forth in the Findings of Fact, the Debtor, who began this adversary proceeding as an individual who was victimized by the violation of his rights under the Bankruptcy Code, has become the legal transgressor by his attempt to defraud the court.[26]  Such a powerful, disturbing conclusion warrants some further explanation of the evidence.

The starting point in the analysis is my unequivocal and certain conclusion that the similarities among the Guest Memorandum, the JPS Damages Section and the 2 Reports cannot be coincidental.  See Findings of Fact Nos. 7-11, 30-31 & accompanying footnotes.  The evidence is clear and convincing that the author of the 2 Reports plagiarized the JPS Damages Section.

These ineluctable findings lead to two (2) more pertinent questions: (1) Who prepared the 2 Reports that plagiarized the JPS Damages Section; and (2) How did it come to pass that the Debtor and his attorneys presented the 2 Reports as Paparo's work product?

## B.  The Preparation of the 2 Reports

I have considered the possibility that there is a relatively benign explanation for the apparent plagiarism.  That explanation would be as follows: Paparo supplied the information that Rutenberg used to prepare the JPS Damages Section in September 2009, but due to his lack of

---

[26]     In Aoude, 892 F.2d at 1118, the court observed that a fraud upon the court "can take many forms" and described the fabrication of a purchase agreement upon which a plaintiff based a breach of contract lawsuit as "a near-classic example of the genre."

formal education and skill, did not prepare anything in writing himself that could be characterized as a "report." In late September 2009, Paparo met with Rutenberg to discuss serving as the expert witness, but backed out a few weeks later. In 2011, facing a deadline to retain an expert witness, the Debtor implored Paparo to reconsider. As a result, Paparo agreed to be the Debtor's expert, which required that Paparo prepare a written report. Rather than draft his own report (due either to laziness or lack of ability), Paparo copied the JPS Damages Section, the substantive content of which he considered to be his own work product.

Under the "benign scenario" outlined above, arguably, there was no fraud in that the 2009 JPS Damages Section was the de facto initial expert report prepared by Paparo (although scrivened by Rutenberg) and, in 2011, Paparo did nothing more than copy a document which contained his own work product. The Debtor's worst offense would have been his reliance on an individual who lacked the ability to write an expert report and, in any event, was not qualified to be an expert. Such facts would neither justify a finding of misconduct or fraud, nor warrant dismissal of the Debtor's claims as a sanction.

The problem, however, is that the record does not support the "benign scenario."

Initially, I find it significant that the Debtor did not articulate the relatively straightforward argument described above and, in fact, presented evidence to contradict it. The Debtor and Paparo both testified that the 2 Reports were legitimate, later versions of an earlier report that Paparo himself prepared in 2009 (that presumably, in their view, served as the basis for the JPS Damages Section). Yet, neither the Debtor nor Paparo produced any document that

even remotely resembled an expert report prepared in 2009.[27]  The Debtor had ample notice of this factual issue and the importance of producing a 2009 version of the 2011 report, if it existed. His failure to make a timely concerted effort to locate the 2009 report and produce it (assuming that such a report ever existed) leads me to discredit the Debtor's testimony on this point. Further, I would have expected the Debtor's attorneys, both of whom testified at the trial, to have offered some support for the "benign scenario."  However, both Sandler and Rutenberg claimed not to understand how the content of the JPS Damages Section was repeated almost verbatim in the 2 Reports.  (3 N.T. at 30, 61).[28]  Their silence was deafening.

More importantly, there is overwhelming, affirmative evidence that belies the "benign scenario."

The linchpin of any benign explanation for the apparent forgery necessarily is that Paparo was the source of the substantive content of the JPS Damages Section.  However, the evidence is compelling that Guest, not Paparo, was the source of the detailed damages calculation set forth in

---

[27]    The Debtor testified initially and unequivocally that Paparo prepared a report in 2009 and that he (the Debtor) had a copy of it.  (4 N.T. at 60, 65, 71).  Later in the trial, he equivocated, testifying that he "may" have a copy and that he would have to "check."  (5 N.T. at 12).  He also implied that his counsel may have it.  Id.  Paparo, too, testified that he prepared a document in 2009 and that he retained it.  (2 N.T. at 25-26).

[28]    To be precise and complete, Rutenberg did testify that he obtained the information he used in drafting the JPS Damages Section in telephone conversations with the Debtor and Paparo.  (3 N.T. at 51-53).  The Debtor seemed to corroborate this.  (4 N.T. at 59-60).  But Rutenberg did not volunteer or suggest that his reliance on Paparo was so substantial as to warrant characterizing the JPS Damages Section as Paparo's work product.  In any event, I do not credit Rutenberg's testimony that Paparo participated substantially in the preparation of the JPS Damages Section.  As stated earlier, it seems indisputable that Guest was the individual knowledgeable about the horse racing industry who provided the primary assistance when Rutenberg drafted the JPS Damages Section prior to its filing in September 2009.  See Finding of Fact Nos. 11-13.  Rutenberg's contrary testimony is troubling.

the JPS Damages Section.  No other conclusion is possible after reviewing the Guest

Memorandum and the JPS Damages Section in sequence.  And, if there were any possible doubt,

such doubt is eliminated by consideration of the Rutenberg Letter.  <u>See</u> Findings of Fact No. 11-

16 & n.16.

  If Paparo did not "author" both the JPS Damages Section and the 2 Reports, the question

becomes: who wrote the 2 Reports that plagiarized the JPS Damages Section?  There are four (4)

likely suspects: Sandler, Rutenberg, Paparo and the Debtor.

  Because I credit Sandler's testimony that the Debtor delivered the Redacted Report and

the Redacted CV to him on the day before the deadline for producing them to the Defendants, I

rule out Sandler and Rutenberg as the authors of the plagiarized report.  This leaves Paparo and

the Debtor.

  As between Paparo and the Debtor, I conclude that it was the Debtor who prepared the 2

Reports by plagiarizing the JPS Damages Section, using Paparo as his "front."  I reach this

conclusion for several reasons.

  First, the Debtor had far greater incentive to engage in this deception than Paparo.  When

he delivered the Redacted Report to Sandler, he was facing an imminent deadline to produce an

expert report in the litigation and the risk that his claim might be extinguished.  Further,

throughout this litigation, and based on my opportunity to observe him in numerous court

appearances, it has become apparent that the Debtor is so emotionally invested in obtaining a

large damage remedy for what he perceives to be the Defendants' unlawful and outrageous

actions that his conduct has reached the point where it could well be characterized as an

obsession.  It is easy to see how the Debtor would convince himself that the end (his righteous

-19-

victory in this litigation) justifies the means (offering fraudulent evidence to the court).

Second, based on my observation of Paparo, he seemed reluctant to be involved in this litigation. I, therefore, infer that the Debtor put pressure on Paparo to assist him, which is consistent with the Debtor taking the lead in manufacturing the evidence at issue.

Third, Paparo appeared to lack the necessary education and skill to carry out the task of preparing the 2 Reports. In general, Paparo has seemed "at sea" in this legal proceeding. By comparison, the Debtor has not hesitated to go front and center (even while represented by counsel) in advocating his position in court and has shown himself to be adept in compiling documents for submission to the court. See, e.g., Order dated October 2, 2009 (Doc. # 98) (directing Clerk not to accept lengthy and inappropriate documents filed by the Debtor).

Fourth, it was the Debtor, not Paparo, who delivered the Redacted Report to Sandler, the Debtor's counsel.

Finally, in a moment of unintended candor at the Paparo deposition, the Debtor made a damaging admission. At the outset of the deposition, after Pocaro pointed out that changes had been made in the initial Unredacted Report (i.e., that the Debtor had provided him with the Amended Unredacted Report), the Debtor blurted out to his own attorney (Sandler):

| Mr. Theokary: | You told me change the four  -- from seven to four. |
| Mr. Sandler: | I didn't tell you anything. |
| Mr. Theokary: | You said to amend it from seven to four. |

(Paparo Deposition at 6-7).

The phrase "seven to four" references the change made by the Amended Unredacted Report regarding the purported loss of breeding revenues and the downward adjustment from

-20-

seven (7) foals per year for five (5) years to four (4) foals over a five (5) year period. See
Findings of Fact Nos. 9-10, 37.[29]

For these reasons, I have determined that the Debtor prepared the 2 Reports by
plagiarizing the JPS Damages Section.

## C. The Presentation of the 2 Reports to the Court

The next question is how did the Debtor come to offer the spurious reports to the court as
Paparo's expert report? More specifically, it is necessary to consider, at least briefly, the role
played by the Debtor's attorneys.

At various points in time, the Defendants have theorized that the Debtor's attorneys
manufactured the false evidence (and thereby must have been active participants in a fraud upon
the court). (See Motion ¶28; 3 N.T. at 6-7). However, based on the record, I am not prepared to
go this far.

While there is some evidence that arguably supports the Defendants' theory, in order to
decide the merits of the Motion and determine the appropriate relief, I need not find that Sandler
and Rutenberg consciously participated in a scheme to defraud the court by presenting counterfeit
evidence; and I make no such finding. It is sufficient to conclude, as I do, that the Debtor
actively engaged in an effort to present false evidence to the court and that his attorneys (without

---

[29]    I do not necessarily infer from this short statement that Sandler instructed the Debtor to
revise the expert report or that Sandler was aware that the Debtor was preparing the Paparo expert
reports. It is equally, if not more, plausible that Sandler was doing no more than pointing out the error in
the report and stating casually that the expert should consider revising the report to correct an obvious
error.  But, the statement shows the Debtor's awareness of the error and the need to correct it, which is
entirely consistent with my conclusion that the Debtor plagiarized the 2 Reports.

necessarily understanding the depth of the Debtor's misconduct) failed to restrain him, thereby

enabling his abuse of the legal system.

I elaborate, briefly.

The sum and substance of Sandler's testimony was that:

- Rutenberg was primarily responsible for drafting the JPS Damages Section. (3 N.T. at 10, 24).

- He and Rutenberg did not have a report from Paparo when the JPS was filed in September 2009.  (3 N.T. at 8).

- In 2011, Sandler received the Redacted CV and the Redacted Report from the Debtor very close to the deadline for production of the report to the Defendants. (3 N.T. at 33-34).

- He forwarded the redacted documents to Pocaro without inquiring as to the identity of the expert and, in fact, at the time, did not know who the expert was.  (3 N.T. at 27-28).

- At no time did Sandler compare the 2 Reports to the JPS Damages Section and, therefore, did not notice the similarities between them.  (3 N.T. at 27, 30).

- He cannot explain why the 2 Reports so closely mirrored the JPS Damages Section.  (3 N.T. at 30).

- Sandler spoke with the Debtor about the error in Paparo's initial expert report regarding the number of foals the mares could bear in a five (5) year period, after which the Amended Unredacted Report was prepared.  (3 N.T. at 21).

I credit Sandler's remarkable testimony that he forwarded an expert report in discovery to

his opposing counsel (Pocaro) without ever having spoken with the expert about the report  –

indeed, without even knowing who the expert was.  Strange as the story may be, it is plausible

that Sandler simply lost control of the litigation to a difficult, demanding, overly-involved,

overly-emotional client.  But crediting Sandler's explanation is not to excuse it.  Nor is it

excusable that Sandler was so uninformed about the damages aspect of the case that he never

noticed that the 2 Reports plagiarized the JPS Damages Section.

Rutenberg's role in this affair is even more troubling. By all accounts, he drafted the JPS

Damages Section. Rutenberg testified that Paparo played a substantial role in assisting him in

preparing the JPS Damages Section, seemingly forgetting about the Guest Memorandum, which

undoubtedly was the source of his work product. More significantly, Rutenberg asks the court to

believe that in 2011, he failed to notice that the 2 Reports lifted almost verbatim the text of the

JPS Damages Section that he had drafted about eighteen (18) months earlier in 2009. If

Rutenberg did not notice the plagiarism, it is fair to question whether he was sufficiently engaged

in performing his obligations as counsel. If he did notice the plagiarism, but failed to intervene,

more troubling questions regarding his professional conduct come to mind.

As explained in Parts IV and V below, for purposes of determining whether sanctions are

appropriate and, if so, what they should be, it is enough that I have concluded that the Debtor was

responsible for the presentation of fraudulent evidence and that his attorneys, without any

specific intent, fell short of their duties as counsel in allowing him to do so.[30]

---

[30]   For the reasons explained below, in Part IV.A., I will not invoke Fed. R. Bankr. P. 9011
to impose any sanctions against Sandler and Rutenberg. However, even if Sandler and Rutenberg did not
intentionally offer fraudulent evidence, the evidence suggests that their conduct fell short of the standard
required by Fed. R. Bankr. P. 9011(b)(3). See generally In re Taylor, 655 F.3d 274, 282 (3d Cir. 2011)
("The concern of Rule 9011 is not the truth or falsity of the representation in itself, but rather whether the
party making the representation reasonably believed it at the time to have evidentiary support"). In this
context, "[r]easonableness has been defined as 'an objective knowledge or belief at the time of the filing
of a challenged paper that the claim was well-grounded in law and fact.'" Taylor, 655 F.3d at 284
(quoting Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir. 1991)). There is also
ample case law to support the principle that Rule 9011 regulates the attorneys' conduct in this matter –
the presentation  to the court of the 2 Reports. Rule 9011(b) encompasses the "presentation" of
documents to the court, whether "by signing, filing, submitting or . . . advocating," Fed. R. Bankr. P.
9011(b)(emphasis added); see Pope v. Federal Express Corp., 49 F.3d 1327, 1328 (8th Cir. 1995)
(plaintiff knowingly offered falsified document into evidence), aff'g 138 F.R.D. 675 (W.D. Mo. 1990);
Derzack v. County of Allegheny, PA, 173 F.R.D. 400, 412-13 (W.D. Pa. 1996) (collecting similar cases);
(continued...)

Next, I turn to the legal authority that I invoke to impose sanctions.

## IV.  APPLICATION OF THE LAW TO THE FACTS  – WHETHER SANCTIONS SHOULD BE IMPOSED

In their counsel's closing argument, the Defendants asserted that the evidence showed the existence of a "conspiracy and . . . a subterfuge regarding the expert report" that "warrants a severe . . . sanction [which is that] the case should be dismissed."  (5 N.T. at 147-48).  The Defendants repeat this request in their post-trial submission, citing as legal authority Federal Rules of Civil Procedure 37 and 41,[31] as well as the Third Circuit's seminal case, Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863 (3d Cir. 1984).  (See Doc. #239).  Given the completion of the trial in this adversary proceeding, I have difficulty conceptualizing how either

---

[30](...continued)
see also Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384, 389-91 (E.D. Cal. 1992) (submission of fraudulent documentary evidence warrants dismissal under both Rule 11 and court's inherent power); Hilgeford v. Peoples Bank, Inc., Portland, Ind., 113 F.R.D. 161, 165 (N.D. Ind. 1986) (sanctioning party who, inter alia, filed papers with "bizarre and incomprehensible arguments" and even filed "self-manufactured documents" purporting to be court orders).

It is difficult to see how counsel's conduct in presenting the 2 Reports as Paparo's genuine expert report could be characterized as objectively reasonable within the meaning of Rule 9011(b)(3).  The bona fides of the report were not well grounded in fact in light of: (a) the obvious plagiarism that I have fully discussed above; (b) the bizarre circumstances in which the Debtor initially presented the initial report to Sandler (i.e., as an anonymous expert report); and (c) counsel's failure to "vet" Paparo sufficiently before presenting him as an expert, given his obvious inadequacies.  In short, the counterfeit nature of the 2 Reports and Paparo's shortcomings as a witness were so apparent that Sandler and Rutenberg did not have a reasonable basis to believe that the evidence they presented was well grounded in fact.  Had their conduct comported with Rule 9011(b)(3), they may have restrained the Debtor from offering false evidence – or, if unable to do so, sought to withdraw as counsel.

[31]      Fed. R. Civ. P. 37 permits a court, inter alia, to dismiss an action upon a party's failure to comply with a discovery order.  See Fed. R. Civ. P. 37(b)(2)(A)(v).  Fed. R. Civ. P. 41(a)(2) permits a court, under certain circumstances, to dismiss an action.

Rule 37 or Rule 41 could serve as the basis for the imposition of sanctions.  However, two (2)

other potential sources of authority for granting the Defendants the relief they seek are Fed. R.

Bankr. P. 9011 and this court's "inherent power."

In Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994),

the Court of Appeals articulated a general, two (2) step analytic framework that courts in this

Circuit must employ when imposing sanctions.  The framework applies, regardless of whether

the court is acting under either the rules of court, such as Fed. R. Civ. P. 11 (or  Fed. R. Bankr. P.

9011) or pursuant to its inherent power:

> First, the court must consider the conduct at issue and explain why the conduct
> warrants sanction.  If an attorney, rather than a client, is at fault, the sanction should
> ordinarily target the culpable attorney.  Obviously, a pattern of wrongdoing may
> require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a
> more severe sanction than might a minor infraction; and wrongdoing that actually
> prejudices the wrongdoer's opponent or hinders the administration of justice may
> demand a stronger response than wrongdoing that, through good fortune or diligence
> of court or counsel, fails to achieve its untoward object. Furthermore, there may be
> mitigating factors that must be accounted for in shaping the court's response.
>
> Second, having evaluated the conduct at issue, the district court must specifically
> consider the range of permissible sanctions and explain why less severe alternatives to
> the sanction imposed are inadequate or inappropriate. . . . [T]he court must explain
> why it has chosen any particular sanction from the range of alternatives it has
> identified.

Id. at 74 (footnotes, citations and quotation marks omitted); see also In re Neurontin Antitrust

Litig., 2011 WL 253434, at *6 (D.N.J. Jan. 25, 2011).

In this part of the Opinion, I focus on the first step in the two (2) step process required by

Republic of Philippines.

I will begin with a brief discussion of Fed. R. Bankr. P. 9011 because, as a general

principle, the preferred method of sanctioning is by rule or statute and a court should refrain from

exercising its inherent power unless the party's conduct is egregious and there is no other basis

for sanctions.  See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d

175, 189 (3d Cir. 2002); Martin v. Brown, 63 F.3d 1252, 1265 (3d Cir. 1995); accord Chambers

v. NASCO, Inc., 501 U.S. 32, 50 (1991).

As explained below, there is some doubt whether Rule 9011 is the appropriate source of

authority for imposing sanctions for the misconduct that occurred in this proceeding.

Consequently, I then discuss the court's inherent power and conclude that the Debtor's conduct

warrants sanction under this authority.


### A. Fed. R. Bankr. P. 9011

### 1.

Fed. R. Bankr. P. 9011, like its counterpart in the civil rules, Fed. R. Civ. P. 11, is

designed to deter abusive practices and otherwise streamline litigation.  See, e.g., In re Schaefer

Salt Recovery, Inc., 542 F.3d 90, 97 (3d Cir. 2008).  The centerpiece of the Rule is found in

subsection (b), which sets forth the standard of conduct to which attorneys and parties acting pro

se must adhere.  For purposes of this proceeding, the pertinent part of Rule 9011(b) states:

> By presenting to the court (whether by signing, filing, submitting, or later
> advocating) a petition, pleading, written motion, or other paper, an attorney or
> unrepresented party is certifying that to the best of the person's knowledge,
> information, and belief, formed after an inquiry reasonable under the
> circumstances,--
>
>> (3) the allegations and other factual contentions have evidentiary support
>> or, if specifically so identified, are likely to have evidentiary support
>> after a reasonable opportunity for further investigation or discovery . . .
>> .

(emphasis added).

As the 1993 Advisory Committee Notes to Rule 11 explained, a litigant's Rule 11 obligations "include reaffirming to the court and advocating positions contained [in papers] after learning that they cease to have merit." Federal Rules Advisory Committee Note (1993); see also O'Brien v. Alexander, 101 F.3d 1479, 1489-90 (2d Cir. 1996); Turner v. Sunguard Bus. Sys., Inc., 91 F.3d 1418, 1421 (11th Cir. 1996).[32]

If the court determines that a violation of Rule 9011(b) has occurred, the court "may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Fed. R. Bankr. P. 9011(c) (emphasis added). The sanction may be non-monetary in nature or monetary, including an order to pay a penalty into the court or the movant's reasonable attorney's fees. Id.

Rule 9011(c) also sets out the procedure that must be followed before sanctions may be imposed. A request for sanctions must be initiated by a party through a separate motion that describes the conduct giving rise to the violation of the Rule. However, the Rule includes a "safe harbor" provision:

> [A] motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion . . . the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected . . . .

Fed. R. Bankr. P. 9011(c)(1)(A).

---

[32]    The cases cited in the text were decided under Rule 11. Because Rule 11 and Rule 9011 are almost identical, matters decided under Rule 11 serve as reliable precedent for Rule 9011. See, e.g., In re Crippen, 346 B.R. 115, 121 n.6 (Bankr. E.D. Pa. 2006) (citing Landon v. Hunt, 977 F.2d 829, 833 n.3 (3d Cir. 1992) and Cinema Serv. Corp. v. Edbee Corp., 774 F.2d 584, 586 (3d Cir. 1985)).

If the moving party does not comply this twenty-one (21) day "safe harbor" notice

requirement, the motion must be denied.  <u>Schaefer</u>, 542 F.3d at 99; <u>see also</u> C. Wright & A.

Miller, <u>Federal Practice & Procedure</u> §1337.2 (West 2012) ("Since the procedural requirements

of the Rule 11 safe harbor provision are designed to protect the person against whom sanctions

are sought and forestall unnecessary motion practice, a failure to comply with them will result in

the rejection of the motion for sanctions as many cases since the 1993 amendment have stated or

held").

The Rule also authorizes the court to impose sanctions on its own motion: "On its own

initiative, the court may enter an order describing the specific conduct that appears to violate

subdivision (b) and directing [a party] to show cause why it has not violated subdivision (b) . . .

." Fed. R. Bankr. P. 9011(c)(1)(B).


**2.**

For several reasons, there is some doubt whether Rule 9011 is the appropriate vehicle for

the court's response to the misconduct that occurred here.

First, it is not entirely clear that the procedural prerequisites to the imposition of sanctions

have been satisfied.  The Motion was not identified as a Rule 9011 motion.  The Defendants did

not comply with Rule 9011's twenty-one (21) day safe harbor requirement before filing the

Motion.  Nor did the court enter a show cause order pursuant to Fed. R. Bankr. P. 9011(c).

On the other hand, there is little doubt that the Defendants made the Debtor aware that

they sought dismissal based on litigation misconduct.  The issues raised by the Motion were tried

in hearings that concluded sixty-two (62) days after the Motion was filed.  At no time did the

Debtor or his counsel raise an objection to the Motion based on the Rule 9011(c)(1)(A) safe

harbor provision or suggest that the Motion did not fully apprise him of the conduct alleged to

warrant the requested sanction. In these circumstances, the Debtor arguably waived any

objection under Rule 9011's safe harbor provision. See, e.g., In re Coastal Land Dev. Corp.,

2009 WL 1515050, at *8-9 (Bankr. S.D. Miss. May 29, 2009) (citing authorities).

At this point, however, it is necessary to distinguish between the Debtor and his attorneys.

Rule 9011 is designed primarily to regulate attorney conduct in a case in which a party is

represented. See Fed. R. Bankr. P. 9011(b) (referring to "an attorney or unrepresented party").

The false evidence was offered to the court while the Debtor was represented. Because the

Motion requested dismissal of the Debtor's claim, it is not clear that Sandler and Rutenberg were

on notice that it may have also been their conduct at issue and that they could personally be

subject to sanctions for their conduct.

Based on the procedural history, I am reluctant to impose a sanction against Sandler and

Rutenberg based on any formal finding that they did not fulfill their duties under Rule 9011(b).

This reluctance is reinforced by my finding that the Debtor was the more culpable actor in the

submission of false evidence to the court.

### B. The Court's Inherent Power

### 1.

Federal courts have the inherent power to impose sanctions in appropriate circumstances.

Chambers, 501 U.S. at 46-47, 50. The Supreme Court has held that "[t]he inherent power of a

court can be invoked even if procedural rules exist which sanction the same conduct." Id. at 49,

-29-

65; accord Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1224 (3d Cir. 1995) ("the advent of Rule 11 and the other statutory sanctions did not eviscerate the courts' inherent power to sanction").  "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." Chambers , 501 U.S. at 50.

Further, as my former colleague Judge Sigmund observed in In re Bailey, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005) (citations omitted):

> Th[e court's inherent] power is exercised in the bankruptcy court pursuant to §105(a) which authorizes the issuance of any order necessary or appropriate to carry out the provisions of the Bankruptcy Code. Where there is sufficient evidence to find an abuse of the judicial system, sanctions may be awarded without regard to the signed document requirement of Rule 9011.

When a court imposes sanctions based on its inherent powers, it must first find that a party has acted in bad faith.  See Chambers, 501 U.S. at 49-50; Prudential Ins. Co., 278 F.3d at 181; Bailey, 321 B.R. at 178.  Further, the court must provide the party to be sanctioned with due process.  Chambers, 501 U.S. at 50.

In this context, due process requires that the respondent receive particularized notice of the conduct at issue, what the party "must address if he is to avoid sanctions" and, of course, an opportunity to be heard in the form of an evidentiary hearing.  Fellheimer, 57 F.3d at 1225 (citing Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1357 (3d Cir. 1990)); see also  Prudential Ins. Co., 278 F.3d at 191 (citing Martin v. Brown, 63 F.3d 1252, 1262 (3d Cir. 1995)); Rogal v. Am. Broad. Cos., Inc., 74 F.3d 40, 44 (3d Cir. 1996); Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994).

In describing the minimum requirements of due process, courts also state that

-30-

particularized notice includes notice of the legal basis for the sanctions.  See In re Tutu Wells

Contamination Litig., 120 F.3d 368, 379-80 (3d Cir. 1997), overruled on other grounds by

Comuso v. Nat'l RR Passenger Corp., 267 F.3d 331 (3d Cir. 2001); GMAC Bank v. HTFC

Corp., 252 F.R.D. 253, 255 (E.D. Pa. 2008).  However, notice of the precise sanctioning tool is

not always required.  E.g., Fellheimer, 57 F.3d at 1225.  Notice is sufficient if the responding

party is aware that he or she is being charged with bad faith conduct and needs to confront this

charge to defend against the imposition of sanctions.  Tutu Wells, 120 F.3d at 379; GMAC Bank,

252 F.R.D. at 255.


## 2.

In this proceeding, I am satisfied that sanctioning the Debtor would not violate his due

process rights.

The detailed allegations set forth in the Defendants' Motion put the Debtor on notice as to

the precise nature of his alleged misconduct.  The Motion further identified the sanction

requested: dismissal of the Debtor's claims.  The Debtor understood both the factual issues

involved in the request for sanctions, as well as the stakes.  Indeed, both sides expended

considerable time during the consolidated trial addressing the bona fides of the 2 Reports that the

Debtor personally vouched for and falsely offered to the court as Paparo's work product.

It is true that the Debtor may not have been aware of the precise legal authority that

serves as the basis for sanctions.  The Motion does not identify the source of law on which the

Defendants rely.  Nor did I state during the trial that I would consider granting relief pursuant to

the court's inherent power.  However, the Debtor never expressed any concern that he would be

prejudiced in preparing his defense against the Motion in the absence of notice of the legal basis

for the sanctions.  Again, this is not surprising.  It would be difficult to argue that a party needs to

know the precise legal authority for the imposition of sanctions to defend against the charge of a

knowing presentation of false evidence to the court.

The bottom line is that the Debtor was on notice as to the specific conduct that the

Defendants alleged should result in the imposition of sanctions, as well as the relief requested by

the Defendants (dismissal of the adversary proceeding).  He had a full and fair opportunity to

present evidence in defense of his position.  Due process requires no more.


### 3.

As for the merits of imposing sanctions against the Debtor pursuant to the court's

inherent power, little more need be said.

I have found that the Debtor knowingly manufactured and presented false evidence to the

court.  He knew that Paparo was neither the primary source of the JPS Damages Section nor the

author of the 2 Reports.  While there may be some conflicting evidence regarding the precise role

played by his counsel, who, at a minimum, failed to fulfill their role as gatekeepers under the

standards set out in Rule 9011(b), the critical point is that I have found that the Debtor was the

primary actor responsible for carrying out the attempted fraud upon the court.  Consequently, the

necessary sanction for this abuse of the legal system should be directed against the Debtor.  See

Chambers, 501 U.S. at 44 (courts have inherent power to set aside their own judgments upon

finding that they were fraudulently obtained); see also Derzack, 173 F.R.D. at 412-13  Olivarria,

144 F.R.D. at 389-91.

# V.  REMEDY

## A.  Legal Standards Governing the Imposition of Sanctions

The Defendants request that the court dismiss the Debtor's claims.  As the Derzack court observed, the Court of Appeals has instructed that courts in this Circuit should determine the propriety of punitive dismissals based upon the application of the standards enunciated in the Poulis case.  Derzack, 173 F.R.D. at 413; accord In re Diet Drugs (Phentermine/Fenfluramine/Dexfenflureamine) Prods. Liab. Litig., 381 F. Supp. 2d 421, 425 (E.D. Pa. 2005); see also Wesley v. Scharf, 2011 WL 5878053, at *2 (W.D. Pa. Sept. 26, 2011).

The Poulis factors are:

    (1)  the extent of the party's personal responsibility;

    (2)  the prejudice to the adversary;

    (3)  a history of dilatoriness;

    (4)  whether the conduct of the party or the attorney was willful or in bad faith;

    (5)  the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and

    (6)  the meritoriousness of the claim or defense.

Poulis, 747 F.2d at 868 (emphasis removed).

In applying these factors, the court must be mindful that dismissal is an extreme sanction insofar as it deprives a litigant of his or her day in court.  Poulis, 747 F.2d at 867-868.  Dismissal should not be imposed unless all doubts are resolved in favor of reaching a decision on the merits.  Derzack, 173 F.R.D. at 414.  Nevertheless, dismissal "must be available to the . . . court [as a sanction] in appropriate cases, not merely to penalize those whose conduct may be deemed

to warrant such a sanction, but to deter those who might be tempted to such conduct in the

absence of such a deterrent." Id. (quotation marks and citation omitted).

Like other judicial decisions involving consideration of a number of factors, the Poulis

test is neither a "magic formula" nor a "mechanical calculation." Id. Nor must each of the Poulis

factors point toward dismissal. Id. Dismissal may be appropriate "so long as the . . . court

carefully considers and weighs the several factors and reasonably exercises his or her discretion

in finding the scales tip toward dismissal." Id. (citing Mindek v. Rigatti, 964 F.2d 1369, 1373

(3d Cir. 1992)).

When the underlying conduct giving rise to the imposition of sanctions is a fraud upon

the court,

> a modified Poulis analysis provides the most suitable framework, the major
> modification being that "prejudice" encompasses not only the prejudice to the
> litigants but also the impact on the judicial system and the threat to the integrity of
> the courts which cannot command respect if they cannot maintain a level playing
> field amongst the participants.

Derzack, 173 F.R.D. at 414; accord Diet Drugs, 381 F. Supp. 2d at 425.


### B.  Dismissal is the Appropriate Sanction

Like the courts in Derzack and Diet Drugs, in this proceeding, after consideration of the

six (6) Poulis factors, I conclude that dismissal is the appropriate sanction based on the exercise

of the court's inherent power.


### 1.  extent of the Debtor's personal responsibility

Both the Debtor and his attorneys are responsible for the submission of false evidence to

the court. However, they are culpable in different degrees. The Debtor, in conjunction with Paparo, manufactured the false evidence. Sandler and Rutenberg violated Rule 9011 by failing to take reasonable steps to determine that the evidence was well grounded in fact. The Debtor is more culpable than his attorneys. He proceeded knowingly and in bad faith. The Debtor's personal responsibility for the misconduct supports dismissal.

### 2. prejudice

"The type of prejudice that will support dismissal of an action for abuse of litigation tactics need not be irreversible, and can consist of the extra costs of repeated delays in filing of motions necessitated by the improper behavior on the part of plaintiffs." Derzack, 173 F.R.D. at 415 (citing Curtis T. Bedwell & Sons v. Int'l Fidelity Ins. Co., 843 F.2d 683, 693–94 (3d Cir.1988)); accord Wesley, 2011 WL 5878053, at *2.

The Debtor's actions prejudiced the Defendants. While the attempted fraud did not succeed, the Debtor's conduct forced the Defendants "to expend time and energy to bring [the Debtor's] actions to the [attention of] the Court in order to ensure that justice is served in this matter." Wesley, 2011 WL 5878053, at *2.[33]

Equally, if not more significant is the prejudice posed by the fraud both to the integrity of legal system and the public interest. Derzack, 173 F.R.D. at 416.

> Our system is built on rules and procedures. Litigants who bring matters before this court must conduct themselves in an appropriate fashion . . . . To impose a

---

[33] One cannot argue that there that there was no prejudice because the scheme did not succeed. The false evidence had "the capacity to influence the adjudication and to hinder [the adversary's] presentation of its case." Aoude, 892 F.2d at 1120.

> less serious sanction [for serious misconduct] would send the wrong message to
> [the transgressor and to] other litigants. Further, there is a public interest in
> discouraging an "anything goes" approach to litigation. Litigants who avail
> themselves to the jurisdiction of the court to seek redress must conduct
> themselves within the orderly administration of justice and the rules of the court.

Perna v. Elec. Data Sys., Corp., 916 F. Supp. 388, 401 (D.N.J. 1995).

This Poulis factor weighs heavily in favor of dismissal.

### 3.  history of dilatoriness

The next factor, whether there has been a history of dilatoriness, seems more suited to cases involving discovery abuses, rather than outright fraud upon the court.  Nonetheless, in similar cases, courts have found this factor to favor dismissal, at least where the offending party continued to defend the propriety of his or her conduct.  See Weslsey, 2011 WL 5878053, at *3 ("Plaintiff clung to his unbelievable attestation that the signatures were genuine. This factor also favors dismissal."); see also Derzack, 173 F.R.D. at 416.  Such is the case in this proceeding.

This has been an extremely contentious dispute.  Throughout, each side, at times, has been overly "personal" in its pleadings and opposition.  Relatively early on, I observed that the parties had inundated the court with unnecessary or procedurally defective motions.  (See Order dated October 12, 2009) (Doc. # 106 n.1).  Therefore, I cannot ascribe to the Debtor or his counsel all of the fault for the uncivil and disproportionate manner in which the parties have conducted themselves in this proceeding.

I assess this factor as either neutral or not particularly applicable.

### 4.  willfulness or bad faith

The <u>Derzack</u> court captured perfectly my assessment of the willfulness or bad faith factor

of the <u>Poulis</u> test as it applies to the facts presented in this proceeding:

> It is hard to imagine a more willful act of fraud on the court than the deliberate,
> elaborate scheme concocted by the plaintiffs to artificially inflate their financial
> picture and advance their position . . . .  It is impossible to imagine how this scheme
> could not have been conducted in bad faith. This factor indicates dismissal as the
> appropriate remedy.

<u>Derzack</u>, 173 F.R.D. at 416-17; <u>accord</u> <u>Wesley</u>, 2011 WL 5878053, at *3.


### 5.  alternative sanctions

I have contemplated imposing a less severe sanction, but concluded that dismissal is the

appropriate remedy.

No type of evidentiary sanction would effectively deter here, particularly given that I have

already excluded the fraudulent evidence based on a traditional application of the rules of

evidence.

Nor do I consider a monetary sanction to be an effective remedy for the Debtor's

misconduct.  The Debtor is, at best, of modest means, so it is by no measure clear that a monetary

sanction would be collectible.  <u>See</u> <u>Wesley</u>, 2011 WL 5878053, at *3.

Moreover, and perhaps most significantly, in a "fraud upon the court" case such as this,

any sanction short of dismissal may be "inherently inadequate to remedy the harm to the public

interest in preserving the integrity of the courts, and in deterring future misconduct on the part of

other litigants."  <u>Derzack</u>, 173 F.R.D. at 417.  As one court stated:

> Permitting this lawsuit to succeed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.

Pope, 138 F.R.D. at 683.

In the circumstances presented here, I conclude that this Poulis factor weighs heavily in favor of dismissal.


### 6.  meritoriousness of the claims and defenses

In this Circuit, case law is clear that there is a distinct policy in favor of deciding cases on the merits.  See, e.g., Medunic v. Lederer, 533 F.2d 891, 893-94 (3d Cir. 1976); accord Ruhle v. Housing Auth. of City of Pittsburgh, 54 F. App'x 61, at *5 n.1 (3d Cir. 2002) (nonprecedential); Scarborough v. Eubanks, 747 F.2d 871, 878 (3d Cir. 1984); Brimage v. Hayman, 2010 WL 3339830, at *1 (D.N.J. Aug. 23, 2010).  A claim or defense is deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by the plaintiff or would constitute a complete defense.  Poulis, 747 F.2d at 869–70.

This Poulis factor usually focuses on the court's review of the parties' pleadings because dismissal is almost always considered as a sanction prior to the commencement of a trial on the merits.  The present proceeding differs in that the evidentiary hearing on sanctions issued was consolidated with the trial on the merits.  Therefore, without making any findings on the factual issues that go to the merits of the Debtor's claim (in the present context, that issue being the amount of monetary damages and counsel fees he would be entitled to as a result of the Defendants' violation of the automatic stay, 11 U.S.C. §362(a)), I will assess this Poulis factor

with reference to the evidence presented at trial.

The Debtor failed to present any expert testimony on the valuation of the Horses (his proposed expert witness having been disqualified by the court). The only evidence in the record on the subject was, therefore, presented by the Defendants. Construed most favorably to the Debtor, the evidence suggested that the Horses were worth $15,000, $1,000 and $1,000, respectively. (See 1 N.T. at 136; 2 N.T. 94, Ex. PD-21).[34] However, there is also no doubt that each horse was encumbered by a stableman's lien in excess of its value at the time of the violation of the automatic stay. See n.24, supra.

On these facts, there is reason to question the merits of the Debtor's damage claim. This is not to say that the violation of the automatic stay involving the sale of over-encumbered property in which there was no equity cannot give rise to a damage award under 11 U.S.C. §362(k). I do not decide that issue. The point here is that the merits of the Debtor's case were not compelling. Nor were the stakes. Relatively speaking, it appears that the economic loss the Debtor suffered due to violation of the automatic stay was modest. Even if the consequences to the Debtor were substantially greater, the type of misconduct that occurred here still could justify the sanction of dismissal. See Derzack, 173 F.R.D. at 418 (dismissing complaint for fraud upon court, even though plaintiff's case presented "important compelling and sensitive legal and factual issues of constitutional dimension, involving personal and familial relationships implicating societal interests").

---

[34]    I emphasize that this is not a finding of fact. These values represent the higher of the amounts for which the Horses were sold some months after the stableman's lien sale or the valuation opined by the Defendants' expert witness.

The merits of the Debtor's cause of action present no obstacle to imposition of the severe sanction of dismissal.

### 7.  balancing the <u>Poulis</u> factors

<u>Poulis</u> instructs that the factors discussed above "should be weighed by . . . courts in order to assure that the 'extreme' sanction of dismissal or default is reserved for the instances in which it is justly merited."  747 F.2d at 870.

This is not a difficult task.

The relevant <u>Poulis</u> factors all favor imposing the penalty of dismissal.  Like the Court of Appeals in <u>Aoude</u>, I find it "difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process  —  to combat those who would dare to practice unmitigated fraud upon the court itself."  892 F.2d at 1119.

## VI.  CONCLUSION

Due to the Debtor's bad faith abuse of the judicial process, I conclude that this adversary proceeding should be dismissed with prejudice pursuant to the exercise of the court's inherent power.  An appropriate order will be entered.

Date:  April 10, 2012

_____
**ERIC L. FRANK
U.S. BANKRUPTCY JUDGE**

# APPENDIX I

**D. STATEMENT OF DAMAGES OR OTHER RELIEF**

**I. FOR PLAINIFF** (sic)

1. Value of horses improperly sold by Defendants - $75,000.00

       A. Macs Derrick T - $40,000.00
       B. Mac Only VP - 21,000.00
       C. Macs Emily BJ - 14,000.00

       Plaintiff would have been entitled to a 20% share of the sale value
pursuant to his lease agreement with The Highland Group, LLC, plus
interest to date and 70% of the lost purse earnings and breeding income, as
set forth below.

2. Lost Earnings:

       A. Macs Derrick T –

       2007 - $36,255 (actual earnings) 2008 - $16,490 (actual earnings) *
* The horse has not raced, apparently, after 2008 in derogation of its fitness and
earning capacity. Further, the said horse was gelded, in derogation of its value for
stud services.

       Remaining years to the end of the lease (2011) were arrived at by the
averaging of the earnings for 2007, 2008 or the sum of $26,372 per year.
2009 - $26,372 2010 - $26,372 2011 - $26,372

The total therefore for the five years is $121, 362.00. It is anticipated that there
will be expert testimony as to the potential earnings and the damages caused by
not racing this horse, even in 2008 (racing said horse less thereby reducing its
earning capacity) and thereafter.

       B. Mac Only VP

2007 – $3,685 2008 - $5,729 (actual earnings, 2007 and 2008). The horse has not
been raced, to the best of Plaintiff' information and knowledge since 2009. This is
in derogation of its value. The remaining years of the lease have been estimated
based on the average of past performance. Plaintiff intends to present expert
testimony in support.

2009 - $4,707 2010 - $4,707 2011 - $4,707.00. Total earnings of $23,535.00

C. Macs Emily BJ

This horse was never raced although it had great potential as a two year old and thereafter. Based on her blood lines and other factors, she had a potential earning capacity in excess of that of Mac's Derrick T. This will be established by expert testimony. It is anticipated that its potential earning capacity will be superior to Mac's Derrick T but for these purposes will be considered the same as Mac's Derrick T = $121,362.00.

This horse was never raced although it had great potential as a two year old and thereafter. Based on her blood lines and other factors, she had a potential earning capacity in excess of that of Mac's Derrick T. This will be established by expert testimony. It is anticipated that its potential earning capacity will be superior to Mac's Derrick T but for these purposes will be considered the same as Mac's Derrick T = $121,362.00.

D. Expenses & Net Profit – It was estimated by the defense that the expenses would be $655.00 per month per horse. This will be rounded to $2,000.00 per month for the three horses a total of $120,000 for the three horses for a period of five years.
The net profit is $146,259.00.

3. Breeding – $1,350,000

A. Macs Derrick T – this horse has a brother who earns $3,000 a session for stud service. It is anticipated that the instant horse, until gelded, would have earned the sum of $144,000 per year for such service (approximately 72 sessions annually).  This would be the sum of $720,000 for the five year period.

B. Macs Only VP – this horse as well as Mac's Emily are mares. It is anticipated that Mac Only VP would have seven foals per annum @ $8,000 = $56,000 or $280.000 for the five year period.

C. Macs Emily BJ It is anticipated that this horse would also have seven foals per annum @ $10,000 = $70,000.00 or $350,000 for the five year period.

D. Expenses – the costs of maintenance would be about 1/3 of the cost of the horses when racing = $40,000 for the five year period.

4. Accessories – the Defendants jointly or severally have removed various

-2-

accessories or equipment of Plaintiff totaling the sum of $11,000.00

5. Punitive Damages – as determined by the court.

6. Counsel fees and costs – as determined by the court upon application of counsel for Plaintiff. This will include all of the attorney's fees incurred by all of the attorneys retained by Plaintiff herein. See 11 U.S.C. § 362 (h).